## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ROXANA ORELLANA SANTOS<br><br>Plaintiff,<br><br>v.<br><br>FREDERICK COUNTY BOARD OF COMMISSIONERS<br>Serve:<br>John Mathias, Esq.<br>Frederick County Attorney<br>12 East Church Street<br>Frederick, Maryland 21701<br><br>and<br><br>Frederick County Sheriff CHARLES JENKINS<br>in his official and individual capacities<br>Frederick County Law Enforcement Center<br>110 Airport Drive East<br>Frederick, MD 21701<br><br>and<br><br>Frederick County Deputy Sheriffs<br>JEFFREY OPENSHAW and JOHN DOE<br>in their official and individual capacities<br>Frederick County Law Enforcement Center<br>110 Airport Drive East<br>Frederick, MD 21701<br><br>and<br><br>Current and Former Immigration and Customs Enforcement<br>Agents JULIE L. MYERS, Former Assistant Secretary,<br>CALVIN MCCORMICK, Field Office Director, Office of<br>Detention and Removal, Baltimore, MD, and JAMES A.<br>DINKINS, Special Agent in Charge, Office of<br>Investigations, Baltimore MD,<br>in their official and individual capacities,<br><br>Defendants. | Civil Action No.<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## COMPLAINT

Plaintiff Roxana Orellana Santos brings this action seeking relief for injuries caused by the acts and/or omissions of Defendants in violation of 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments of the United States Constitution and Title VI of the Civil Rights Act of 1964.

## INTRODUCTION

1.      This action arises out of Defendants' unlawful and unconstitutional interrogation and detention of individuals based solely on their race and/or ethnicity; Defendants' failure to properly train local law enforcement officers regarding the scope of their authority under, and proper implementation of, the 287(g) agreement between Frederick County and the United States Department of Homeland Security; Defendants' implementation of policies and practices that condone and perpetuate the unlawful behavior at issue in this Complaint; and Defendants' unlawful interrogation and arrest of Ms. Orellana Santos based solely on her perceived race and/or ethnicity and without any reasonable suspicion or probable cause.

## PARTIES

2.      Plaintiff ROXANA ORELLANA SANTOS ("Ms. Orellana Santos") is an adult resident of Frederick County. Ms. Orellana Santos is originally from El Salvador. She entered the United States in October 2005 and has lived with her husband in Frederick for approximately four years. Ms. Orellana Santos and her husband have a two-year-old son, who is a United States citizen. On October 7, 2008, while quietly eating her lunch, Ms. Orellana Santos was confronted and detained by two Frederick County deputy sheriffs. Despite having committed no criminal offense under Maryland law, Ms. Orellana Santos was detained, taken into custody and subsequently transferred to the custody of U.S. Immigration and Customs Enforcement. After

2

temporary detention in the Frederick County Adult Detention Center and Baltimore Adult Detention Center, ICE transferred Ms. Orellana Santos to the Dorchester County Jail in Cambridge, Maryland, where she remained until her supervised release on or about November 13, 2008.

3.     Defendant CHARLES JENKINS is the Sheriff of Frederick County, Maryland. Under state and municipal law, he is charged with ultimate responsibility for the training and supervision of Frederick County Sheriff's Office ("FCSO") Deputies, and for the administration and implementation of FCSO policies, practices, and/or customs. Defendant Jenkins is also the FCSO signatory of a memorandum of agreement with U.S. Immigrations and Customs Enforcement ("ICE"), which authorizes certain deputy sheriffs to carry out limited, specified functions of federal immigration officers (the "287(g) MOA"). Defendant Jenkins is sued in his official and individual capacities. During all times relevant to this Complaint, Defendant Jenkins was acting under color of state law as a law enforcement agent of Frederick County.

4.     Defendant JEFFREY OPENSHAW is a deputy sheriff of the FCSO. He is responsible for carrying out the policies, practices, and/or customs of the FCSO. Defendant Openshaw arrested Ms. Orellana Santos without the authority to do so. He is sued in his official and individual capacities. During all times relevant to this Complaint, Defendant Openshaw was acting under color of state law as a law enforcement agent of Frederick County.

5.     Defendant JOHN DOE is a deputy sheriff of the FCSO. He is responsible for carrying out the policies, practices, and/or customs of the FCSO. He also participated in the arrest of Ms. Orellana Santos on or about October 7, 2008, but his identity is unknown. Upon information and belief, Defendant Doe was not certified to carry out functions of federal immigration officers under the 287(g) MOA. He is sued in his official and individual capacities.

During all times relevant to this Complaint, Defendant John Doe was acting under color of state law as a law enforcement agent of Frederick County.  Plaintiff is unaware of the true name of Defendant Doe, and therefore sues this Defendant by fictitious name.  This Doe Defendant is responsible and liable for the acts and/or damages alleged in this Complaint.  Plaintiff will amend this Complaint to allege the Doe Defendant's true name and capacity when they have been ascertained.

6.      Defendant FREDERICK COUNTY BOARD OF COMMISSIONERS ("BOCC") is a Maryland commissioner county.  It fully funds the FCSO, which operates under a set of law enforcement policies, practices and customs directed and affected by Frederick County. Frederick County is sued under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), for the execution of its unconstitutional customs and policies.

7.      Defendant JULIE L. MYERS is the former Assistant Secretary for Homeland Security of Immigration and Customs Enforcement.  She was the ICE signatory for the 287(g) MOA with the FCSO.  By signing the 287(g) MOA, she agreed to accept the terms, responsibilities, obligations and limitations of the agreement.  Defendant Myers is sued in her official and individual capacities.  During all times mentioned in this Complaint, Defendant Myers was acting under color of federal law.

8.      Defendant CALVIN McCORMICK is the Field Office Director of the ICE Office of Detention and Removal ("DRO") in Baltimore, Maryland.  He is named as the ICE DRO point of contact in the 287(g) MOA between FCSO and ICE.  As such, he is responsible for the supervision of the FCSO in the implementation of the 287(g) MOA, including ensuring compliance with immigration laws and procedure and assessing the need for additional

individual training and/or guidance.  He is sued in his official and individual capacities.  At all

relevant times, Defendant McCormick was acting under color of federal law.

9.      Defendant JAMES A. DINKINS is the Special Agent in Charge of the ICE Office

of Investigations ("OI") in Baltimore, Maryland.  He is named as an ICE point of contact under

the 287(g) MOA with the FCSO.  As such, he is responsible for the supervision of FCSO in its

implementation of the 287(g) MOA, including ensuring compliance with immigration laws and

procedure and assessing the need for additional training or guidance.  He is sued in his official

and individual capacities.  At all relevant times, Defendant Dinkins was acting under color of

federal law.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over Plaintiff's claims arising under the U.S.

Constitution and federal statutes pursuant to 28 U.S.C. §§ 1331, 1343, and 1361.  Jurisdiction to

grant declaratory judgment is conferred by 28 U.S.C. §§ 2201-02.

11.      Venue is proper in this district under 28 U.S.C. § 1391(b) in that all events

complained of and giving rise to Plaintiff's claims arose in this district.

## STATEMENT OF FACTS

**I.**      **Immigration Law Enforcement in Frederick County under Sheriff Charles Jenkins**

12.      In 2006, Defendant Jenkins was elected as Sheriff of Frederick County. During

his campaign, he claimed that Frederick County was experiencing a violent crime wave fueled

by the "nationwide illegal immigration problem."  He also warned that Frederick County was

home to a number of potential terrorist targets, necessitating "a strategic countywide plan for

homeland security." His campaign for sheriff was based largely on promises of increased

immigration enforcement.

5

13.     Upon assuming office, Defendant Jenkins engaged in anti-immigrant rhetoric.  In 2007, he stated that undocumented aliens were moving to Frederick County from Northern Virginia, but that he planned to "shoot them right back."  He stated that "the single biggest threat to our country is the immigration problem. We cannot continue to absorb this population or we will end up in collapse like a Third World Country."

14.     During Defendant Jenkins' tenure as Sheriff, Frederick County has devoted an increasingly greater share of its resources to the enforcement of federal immigration laws, as distinct from state and local criminal laws.

15.     Under Defendant Jenkins' leadership, FCSO signed an Inter-Governmental Service Agreement ("IGSA") with ICE, renting out cells in the Frederick County Adult Detention Center for ICE detainees.

16.     Although it costs the Frederick County Adult Detention Center approximately $7 a day to house an immigration detainee, ICE reimburses Frederick County $83 per day for each detainee.  In 2008, Frederick County received over $1,000,000.00 in reimbursement for holding ICE detainees at the Frederick County Adult Detention Center as part of the IGSA program.

17.     In 2008, due in large part to Defendant Jenkins' efforts, FCSO also became the first local agency in Maryland to participate in the "287(g) program" run by ICE and authorized by an amendment to the Immigration and Nationality Act (INA).

18.     Under Section 287(g) of the INA, 8 U.S.C. § 1357(g), the Department of Homeland Security has authority to enter into agreements with state and local law enforcement agencies, pursuant to which selected officers receive certification to carry out certain functions of federal immigration officers.

19.     The main objective of the 287(g) program is to address serious criminal activity, such as violent crimes, gang activity, narcotics smuggling and other felonies committed by foreign nationals.   Participation in the 287(g) program authorizes local law enforcement to investigate the immigration status and perform certain functions of federal immigration officials where an individual has committed a crime and has already been detained by local law enforcement.

20.     On or about February 5, 2008, Defendant Jenkins, on behalf of the FCSO, signed a Memorandum of Agreement with ICE (the "287(g) MOA").   Julie Myers, the Assistant Secretary of Homeland Security for U.S. Immigration and Customs Enforcement at the time, signed on behalf of the Department of Homeland Security.   The 287(g) MOA names Defendants Calvin McCormick, the ICE Field Office Director in Baltimore, and James A. Dinkins, an ICE Special Agent in Baltimore, as federal "points of contact" for the implementation of the MOA.

21.     Defendant Jenkins has stated that the 287(g) MOA is designed to address national security concerns and to make Frederick County a safer place by ridding the county of "criminal aliens" – individuals who commit serious, violent crimes and who are not lawfully present in the United States.

## II.     FCSO's Limited Authority to Perform Immigration Enforcement Functions Under the 287(g) MOA

22.     Consistent with the terms of INA § 287(g), the federal government requires all local law enforcement officers to successfully complete a four-week training program as a prerequisite to receiving certification to carry out certain functions of federal immigration officers.

23.     Under the 287(g) MOA, only FCSO personnel that have completed the requisite training are authorized to carry out certain functions of federal immigration officers (the "LEA personnel").

24.     The 287(g) MOA provides:

Only participating LEA personnel who are selected, trained, authorized, and supervised, as set out herein, have authority pursuant to this MOA to conduct the immigration officer functions enumerated in this MOA.

25.     Defendant Jenkins designated twenty-six members of the FCSO to undergo the required training.

26.     As of October 7, 2008, Defendant Openshaw had not received the training, was not a certified officer within the meaning of the 287(g) MOA and, therefore, was not authorized to conduct immigration officer functions.

27.     Upon information and belief, as of October 7, 2008, Defendant Doe had not received the training, was not a certified officer within the meaning of the 287(g) MOA and, therefore, was not authorized to conduct immigration officer functions.

28.     The 287(g) MOA does not provide LEA personnel with generalized authority to act as immigration agents.  Rather, the 287(g) MOA confers limited authority to perform certain immigration enforcement functions in connection with on-going criminal investigations.  The 287(g) MOA provides, in part:

Participating LEA personnel will be exercising their immigration-related authorities during the course of criminal investigations involving aliens encountered within Frederick County.

29.     Under the agreement, FCSO is "expected to pursue to completion prosecution of the State or local charges that caused the individual to be taken into custody."  ICE assumes

custody of individuals only after those individuals have concluded service of any sentence of incarceration for violation of state and local laws.

30.     Defendant Jenkins has repeatedly stated that the FCSO "will only begin (an immigration investigation) after an arrestable offense."   According to Defendant Jenkins, individuals must be arrested and brought into the jail through the central booking system before their status is checked because "we don't do this enforcement on the street."

31.     Under Section XI of the 287(g) MOA, the FCSO immigration enforcement activities "will be supervised and directed by ICE supervisory officers or the designated team leader in Baltimore, Maryland."   LEA personnel "are not authorized to perform immigration officer functions, except when working under the supervision of an ICE officer, or when acting pursuant to the guidance provided by an ICE agent."

32.     The 287(g) MOA also provides that the actions of LEA personnel "will be reviewed by ICE supervisory officers on an ongoing basis to ensure compliance with the requirements of the immigration laws and procedures and to assess the need for individual additional training or guidance."

**III.**     **Implementation of the 287(g) Program**

33.     In January 2009, the United States Government Accountability Office issued a report to Congress regarding the implementation of 287(g) programs throughout the country entitled "Better Controls Needed over Program Authorizing State and Local Enforcement of Federal Immigration Laws" (the "GAO Report").

34.     The GAO report concluded that ICE lacked internal controls for implementation of the 287(g) program:

> The 287(g) program lacks several management controls that limit ICE's ability to effectively manage the program.  First, ICE has not documented the program's

objectives in program-related materials. Second, program related documents, including the MOA, lack specificity as to how and under what circumstances participating agencies are to use 287(g) authority, or how ICE will supervise the activities of participating agencies. Third, ICE has not defined what program information should be tracked or ensured that program information is being consistently collected and communicated, which would help ensure that management directives are followed. And finally, ICE has not developed performance measures to assess the effectiveness of the 287(g) program and whether it is achieving its intended results.

GAO Report at 10.

35.     The GAO Report also concluded that ICE has not consistently communicated to participating agencies the scope of their authority or the circumstances under which certified officers may exercise their powers under the 287(g) MOA.  The GAO Report noted the potential for misuse of authority, stating "Another potential consequence of not having documented program objectives is misuse of authority."  GAO Report at 13.

36.     Upon information and belief, since execution of the 287(g) MOA, Defendants Myers, McCormick and Dinkins have not provided written guidance to the FCSO regarding the program's objectives, have not provided clear guidance about when and how an officer may exercise his 287(g) authority, and have not implemented performance measures to evaluate whether the program is achieving its objectives.  Defendants' failures to take these measures have contributed to and proximately caused the unlawful practices and conduct at issue in this Complaint.

37.     Contrary to Defendant Jenkins' remarks, FCSO's implementation of the 287(g) MOA has not focused on violent crimes or national security.  Rather, it has resulted in a discriminatory practice and policy of targeting and interrogating individuals about their immigration status based solely on their perceived race, national origin or ethnicity and selective

enforcement of state and local law by, for example, using minor traffic offenses as a pretense for enforcement of federal immigration laws under the guise of the 287(g) program.

38.     The majority of individuals detained by the FCSO under the 287(g) MOA, have not been charged with violent crimes.

39.     In 2008, approximately 50% of the individuals detained by the FCSO under the 287(g) MOA were arrested for driving without a license.   Another 10% of the individuals detained by the FCSO under the 287(g) MOA were charged with misdemeanor traffic offenses. Less than 10% of the individuals detained by the OSCO in 2008 under the 287(g) MOA were charged with felonies.

40.     In 2008, over 90% of the individuals arrested by the FCSO and detained under the 287(g) MOA were of Latino descent.

**IV.     The Arrest of Roxana Orellana Santos by FCSO Deputy Sheriffs**

41.     At approximately 11:30 a.m. on October 7, 2008, Ms. Orellana Santos was sitting alone on a curb at a grassy area behind a food co-op near Evergreen Square on Buckeystown Pike in Frederick, Maryland.   She was quietly eating her lunch and looking out onto a newly-built pond behind a row of stores.

42.     Ms. Orellana Santos was not engaged in any unlawful or suspicious activity, nor was she engaged in activity that reasonably could have been perceived as unlawful.

43.     While Ms. Orellana Santos was eating her lunch, a patrol cruiser of the FCSO drove by her.   When Defendant Openshaw and Defendant Doe, the officers in the patrol cruiser, saw Ms. Orellana Santos, they stopped the car, got out of the vehicle and approached Ms. Orellana Santos.

44.     Upon information and belief, Defendants Openshaw and Doe stopped the car solely because they intended to interrogate Ms. Orellana Santos about her immigration status based on her perceived race, ethnicity and/or national origin.

45.     As Defendants Openshaw and Doe approached Ms. Orellana Santos, who was seated on the curb, one of them asked her if she was eating lunch.  Ms. Orellana Santos told Defendants "yes" and confirmed that she was eating lunch.

46.     One of the Defendants proceeded to ask Ms. Orellana Santos for identification. She told Defendants that she did not have any identification with her.

47.     One of the Defendants then asked Ms. Orellana Santos if she had a passport.  Ms. Orellana Santos told Defendants that her passport was at home.

48.     Although Defendants had no reasonable basis to detain Ms. Orellana Santos for further questioning, for some time, Defendants continued to stand in close proximity to Ms. Orellana Santos, talking to each other and periodically looking down at Ms. Orellana Santos.

49.     With Defendants standing over her and watching her, Ms. Orellana Santos did not feel free to leave or otherwise terminate the encounter.

50.     After a few minutes passed, Ms. Orellana Santos remembered that she had a national identification card in her purse, which she then retrieved and showed to Defendants, hoping they would be satisfied and would leave her alone.

51.     One of the Defendants took the identification, examined it and appeared to use his radio while the other Defendant watched Ms. Orellana Santos and made hand gestures to her indicating that she should stay seated.

52.     Ms. Orellana Santos did not feel free to leave or otherwise terminate the encounter because Defendants were in possession of her identification card and were standing over her, watching her, and gesturing that she should stay put.

53.     Ms. Orellana Santos is a native Spanish speaker with limited proficiency in English.   Neither Defendant Openshaw nor Defendant Doe spoke Spanish and could not communicate with Ms. Orellana Santos about why they had stopped, taken her identification card or were preventing her from leaving.

54.     After approximately 15 minutes, Ms. Orellana Santos, who had been seated on the curb the entire time, stood up and reached down to collect her purse.

55.     As Ms. Orellana Santos stood up, one of the Defendants put his hands on her shoulders to prevent her from leaving, while the other Defendant proceeded to handcuff Ms. Orellana Santos with her hands behind her back and place her in the backseat of the cruiser.

56.     Defendants transported Ms. Orellana Santos to the Frederick County Adult Detention Center ("ADC"), where she was detained for a night before being transported to the Baltimore Detention Center.

57.     Ms. Orellana Santos was not arrested for or charged with the violation of any state, local or federal criminal law.   No incident or arrest report has been filed by Defendants relating to Ms. Orellana Santos' arrest.

58.     Approximately two days later, Ms. Orellana Santos was transferred to Dorchester County Jail in Cambridge, Maryland.   On or about November 11, 2008, she was granted supervised release for humanitarian concerns.

59.     At the time of her release, Ms. Orellana Santos had been in custody for five weeks and there had still been no incident or arrest report filed relating to Ms. Orellana Santos' arrest, nor had she been charged with the violation of any state, local or federal criminal law.

60.     At the time of Ms. Orellana Santos' arrest, Defendant Openshaw was not certified as a LEA personnel under the 287(g) MOA.  As such, Defendant Openshaw had no authority to enforce the civil provisions of federal immigration law.

61.     Upon information and belief, at the time of Ms. Orellana Santos' arrest, Defendant Doe was not certified as a LEA personnel under the 287(g) MOA.  As such, Defendant Doe had no authority to enforce the civil provisions of federal immigration law.

62.     Nevertheless, Defendants Openshaw and Doe approached and interrogated Ms. Orellana Santos without reasonable, individualized, articulable suspicion that Ms. Orellana Santos was involved in unlawful activity and without the authority to enforce federal civil immigration law.  They had no legitimate factual or legal basis to approach, interrogate or detain Ms. Orellana Santos.

63.     Upon information and belief, Defendant Jenkins has directed, encouraged, aided, abetted, and/or permitted deputies of the FCSO who are not 287(g)-certified to nonetheless enforce civil immigration law, and to do so in a manner inconsistent with various provisions of the U.S. Constitution.

64.     Defendant Jenkins knew or should have known that the policies and practices that he implemented and condoned were likely to result in unlawful discrimination by FCSO officers, and knew or should have known that such policies were likely to result in FCSO officers exceeding the bounds of their authority.

65.    Moreover, Defendant Jenkins knew or reasonably should have known that the enforcement of immigration law by non-287(g) deputized officers is preempted by federal law and therefore violative of state and federal law.

66.    Upon information and belief, Defendant Jenkins directed, encouraged, aided, abetted, and/or permitted this unlawful behavior as part of his ongoing anti-immigrant campaign, and in reckless and/or negligent disregard for the constitutional rights of those who are, or who are perceived to be, non-citizens in Frederick County.

67.    As Sheriff, Defendant Jenkins has supervision over enforcing the policies, practices, and customs administered by Frederick County.

68.    Defendant Frederick Board of County Commissioners fully funds FCSO and its employees, including Defendants Jenkins, Openshaw and Doe in their law enforcement duties.

69.    Upon information and belief, ICE Defendants Myers, McCormick, and Dinkins, by failing to engage in effective supervision of the FCSO under the 287(g) MOA, have also acted in reckless and/or negligent disregard for the constitutional rights of those who are, or who are perceived to be, non-citizens in Frederick County.

## V.    Effect on Plaintiff Orellana Santos and the Immigrant Community at Large

70.    Defendants' unlawful arrest and detention of Ms. Orellana Santos and the restrictions Defendants placed on her liberty caused Ms. Orellana Santos to suffer humiliation, emotional distress, physical pain and suffering, as well as monetary damages.

71.    Ms. Orellana Santos continues to fear that she, her family, and/or her acquaintances will be arbitrarily and unlawfully arrested by officers of FCSO.

72.    Moreover, the discriminatory and otherwise unlawful actions committed and/or permitted by Sheriff Jenkins and the members of the FCSO have created a climate of fear among

immigrants, Latinos, and those perceived to be of either or both groups, who reside, work, and/or travel through Frederick County.

## FIRST CLAIM FOR RELIEF

### UNLAWFUL ARREST
### 42 U.S.C. § 1983 Claim in Violation of the Fourth Amendment to the U.S. Constitution
### (Defendants Openshaw and Doe in their Official and Individual Capacities)

73.     Ms. Orellana Santos repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

74.     Federal law preempts state or local police from enforcing federal civil immigration laws and deprives local law enforcement officials of the authority to make civil immigration arrests beyond narrow circumstances not relevant to Ms. Orellana Santos' arrest.

75.     Under INA § 287(g) and the 287(g) MOA, only officers that have been trained and certified may perform certain functions of federal immigration officers.

76.     Defendants Openshaw and Doe were not trained or certified under the 287(g) MOA and did not have authority to enforce federal immigration law.

77.     Ms. Orellana Santos was not charged or arrested for violation of a criminal law.

78.     Defendants Openshaw and Doe arrested Ms. Orellana Santos without the legal authority to do so and in the absence of any exigent circumstances, probable cause, or reason to believe that she had or was engaged in criminal activity.

79.     As a result of the Defendants' actions, Ms. Orellana Santos suffered damages, including but not limited to violation of her constitutional rights, loss of liberty, monetary damages, emotional distress, and physical pain and suffering.

## SECOND CLAIM FOR RELIEF

### EQUAL PROTECTION
**42 U.S.C. § 1983 Claim in Violation of the Fourteenth Amendment to the U.S. Constitution
(Defendants Openshaw and Doe in their Official and Individual Capacities)**

80.     Ms. Orellana Santos repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

81.     Defendants Openshaw and Doe stopped their police cruiser, approached Ms. Orellana Santos and interrogated her regarding her immigration status based solely on her perceived race, ethnicity and/or national origin.

82.     Defendants Openshaw and Doe subjected Plaintiff Orellana Santos to selective law enforcement out of a bad faith and unlawful intent to drive her and other residents of Latino and/or foreign-born appearance from Frederick County.

83.     In interrogating and detaining Ms. Orellana Santos, Defendants Openshaw and Doe intentionally treated her differently from other similarly situated residents without any rational basis for doing so.

84.     These actions violated Ms. Orellana Santos' right to Equal Protection under the Fourteenth Amendment of the United States Constitution.

85.     As a result of the Defendants' actions, Plaintiff Orellana Santos suffered damages, including but not limited to violation of her constitutional rights, loss of liberty, monetary damages, emotional distress, and physical pain and suffering.

86.     As a result of the Defendants' actions, Plaintiff Orellana Santos fears that she will be stopped, interrogated and treated unfairly and in a discriminatory manner by law enforcement officers in the FCSO.

## THIRD CLAIM FOR RELIEF

### UNLAWFUL SEIZURE
### 42 U.S.C. § 1983 Claim in Violation of the Fourth and Fourteenth Amendments to the U.S. Constitution
### (Defendants Openshaw and Doe in their Personal and Official Capacities)

87.     Ms. Orellana Santos repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

88.     Defendants Openshaw and Doe interrogated and detained Ms. Orellana Santos based on nothing more than her actual or perceived race, ethnicity, and/or national origin.

89.     Defendants had no reasonable, individualized, articulable suspicion that Ms. Orellana Santos was involved in unlawful activity.

90.     Neither Ms. Orellana Santos, nor a reasonable person, would have felt free to leave or free to terminate the encounter because:

   a.   Defendants appeared to have specifically stopped and exited their car for the sole purpose of investigating Ms. Orellana Santos' immigration status;

   b.   Defendants were in uniform and, upon information and belief, were armed;

   c.   Defendants approached Ms. Orellana Santos jointly and with purpose;

   d.   Even after Ms. Orellana Santos answered Defendants' questions, Defendants continued to stand over her and watch her;

   e.   One of the Defendant Deputy Sheriffs took Ms. Orellana Santos' identification card while the other Defendant watched Ms. Orellana Santos and gestured to her that she should stay seated;

   f.   For approximately 15 minutes, Defendants continued to watch Ms. Orellana Santos and, through their body language, gestures and conduct, communicated that Ms. Orellana Santos was not free to leave or terminate the encounter;

     g.   When Ms. Orellana Santos stood and reached down for her purse, one of the Defendants placed his hands on her shoulders while the other Defendant handcuffed her and placed her in the patrol car; and

     h.   Defendants could not effectively communicate with Ms. Orellana Santos because they did not speak Spanish.

91.    When Defendants Openshaw and Doe took and retained Ms. Orellana Santos' identification and prevented her from leaving, they seized her.

92.    Defendants Openshaw and Doe's conduct violated Ms. Orellana Santos' right to be free from unreasonable seizures under the Fourth and Fourteenth Amendments of the United States Constitution.

93.    As a result of the Defendants' actions, Ms. Orellana Santos suffered damages, including but not limited to violation of her constitutional rights, loss of liberty, monetary damages, emotional distress, and physical pain and suffering.

94.    As a result of the Defendants' actions, Plaintiff Orellana Santos fears that she will be stopped, interrogated and treated unfairly and in a discriminatory manner by law enforcement officers in the FCSO.

### FOURTH CLAIM FOR RELIEF

**CONSPIRACY**
**42 U.S.C. § 1985(3) Claim in Violation of the Fourteenth**
**Amendment to the U.S. Constitution**
**(Defendants Openshaw and Doe in their Official and Individual Capacities)**

95.    Plaintiff Orellana Santos repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

96.     Defendants Openshaw and Doe entered into an agreement, between and among themselves, to act in concert for the purpose of depriving Ms. Orellana Santos of equal protection under the law and her right to be free from unreasonable seizures.

97.     Defendants Openshaw and Doe knew or should have known that they were not authorized to perform immigration officer functions.

98.     Defendants Openshaw and Doe knew or should have known that Ms. Orellana Santos was not engaged in any suspicious or unlawful activity.

99.     Defendants Openshaw and Doe knew or should have known that it is unlawful to detain and interrogate an individual solely on the basis of her actual or perceived race, ethnicity and/or national origin.

100.     Notwithstanding the foregoing, Defendants Openshaw and Doe conspired to stop the police cruiser, approach and detain Ms. Orellana Santos in an effort to prevent her from leaving and to question Ms. Orellana Santos regarding her immigration status.

101.     Defendants Openshaw and Doe's actions in detaining and interrogating Ms. Orellana Santos constitute acts in furtherance of that conspiracy.

102.     Defendants Openshaw and Doe's conspiracy to violate Ms. Orellana Santos' right to equal protection under the Fourteenth Amendment and right to be free from unreasonable seizures under the Fourth Amendment violated 42 U.S.C. § 1985(3).

103.     As a result of the conspiracy between and among the Defendants and the overt actions taken in furtherance thereof, Ms. Orellana Santos suffered damages, including but not limited to violation of her constitutional rights, loss of liberty, monetary damages, emotional distress, and physical pain and suffering.

## FIFTH CLAIM FOR RELIEF

### PERSONAL SUPERVISORY LIABILITY
### 42 U.S.C. § 1983
### (Defendant Jenkins in his Official and Individual Capacities)

104.    Ms. Orellana Santos repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

105.    Defendant Jenkins was personally involved in and proximately caused the aforementioned violations of Plaintiff Orellana Santos' rights by knowingly and intentionally creating, implementing, enforcing, encouraging, sanctioning, and/or acquiescing in a policy, practice, and/or custom in which local law enforcement officials engaged in the unconstitutional conduct described in the foregoing claims.

106.    Defendant Jenkins was personally involved in and proximately caused the aforementioned violations through his deliberate indifference to Ms. Orellana Santos' rights and his grossly negligent supervision of his subordinates, including but not limited to Defendants Openshaw and Doe.

107.    Defendant Jenkins, the Frederick County Sheriff, is responsible for implementing and administering the policies, practices, and/or customs of the FCSO.

108.    Defendant Jenkins is also responsible for supervising all FCSO deputies in the commission of their duties.

109.    Defendant Jenkins was aware that the implementation of the 287(g) MOA in Frederick County has not focused on addressing serious, violent crimes committed by undocumented foreign nationals, but instead has resulted in officers using minor traffic offenses as a pretense to check the immigration status of individuals perceived to be of Latino descent.

21

110.    Defendant Jenkins was or should have been aware that FCSO deputies have stopped, interrogated and detained individuals based solely on their perceived race, ethnicity and/or national original and have arrested individuals for violation of federal immigration law, even though those individuals have committed no criminal offense under Maryland law.

111.    Defendant Jenkins was or should have been aware that FCSO deputies that are not trained or certified under the 287(g) MOA have been performing immigration enforcement functions.

112.    Upon information and belief, Defendant Jenkins' anti-immigrant rhetoric and FCSO's financial incentive to arrest and detain as many undocumented foreign nationals as possible under the IGSA program, have fostered an atmosphere that is conducive to and has encouraged and/or tolerated selective enforcement of local laws and discriminatory practices in the FCSO's implementation of the 287(g) MOA.

113.    As a result of Defendant Jenkins' acts and/or omissions, Ms. Orellana Santos suffered damages, including but not limited to violation of her constitutional rights, loss of liberty, monetary damages, emotional distress, and physical pain and suffering.

114.    As a result of the Defendants' actions, Plaintiff Orellana Santos and others in the community fear that they will be stopped, interrogated and treated unfairly and in a discriminatory manner by law enforcement officers in the FCSO.

## SIXTH CLAIM FOR RELIEF

### VIOLATION OF CIVIL RIGHTS ACT
### 42 U.S.C. § 2000d Claim for Violation of Title VI of the Civil Rights Act of 1964
### (Defendant Frederick County Board of Commissioners)

115.    Ms. Orellana Santos repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

116.    Defendants Openshaw and Does' decision to stop, detain and interrogate Ms. Orellana Santos was based solely on her actual or perceived race, ethnicity, and/or national origin.

117.    Defendants Openshaw and Doe were acting in accordance with the pattern and practice of discrimination on the basis of perceived race, ethnicity and/or national origin that had been established and tolerated within the FCSO.

118.    Defendant Jenkins condoned the discriminatory practices of the officers that he supervised.

119.    The Board of County Commissioners fully funds the FCSO, which operates under a set of law enforcement policies, practices and customs directed and affected by Frederick County.

120.    The FCSO and the BOCC receive federal financial assistance and funding from the United States government for their participation in the IGSA program and, upon information and belief, for their participation in the 287(g) program.

121.    The conduct of the FCSO has denied and will deny Ms. Orellana Santos the right to be free from discriminatory treatment under 42 U.S.C. § 2000d.

### SEVENTH CLAIM FOR RELIEF

**ENTITY LIABILITY**
**(Defendant Frederick County Board of Commissioners)**

122.    Ms. Orellana Santos repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

123.    Frederick County Board of Commissioners is liable pursuant to *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), for the promulgation of county policy

and/or custom by Defendants Jenkins, Openshaw and Doe prior to and during the arrest of Plaintiff Orellana Santos on October 7, 2008.

124.    Defendant Frederick County Board of Commissioners fully funds the FCSO, including employees Jenkins, Openshaw and Doe.

125.    Defendant Frederick County acted with extreme and deliberate indifference to the risk of possible constitutional violations in its lack of adequate training of deputies in the proper criteria for stopping, questioning, and arresting individuals.

### EIGHTH CLAIM FOR RELIEF

**FAILURE TO SUPERVISE**
**(Defendants Myers, McCormick and Dinkins in their Official and Individual Capacities)**

126.    Ms. Orellana Santos repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

127.    Defendants Myers, McCormick and Dinkins are liable in their individual capacities as the supervisors of the 287(g) agreement between FCSO and ICE, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

128.    At all relevant times, Defendants Myers, McCormick and Dinkins were responsible for supervising, monitoring and ensuring FCSO's compliance with the 287(g) MOA.

129.    Defendants McCormick and Dinkins were responsible for ensuring that FCSO complied with federal immigration laws and procedure and for assessing the need for additional training and/or guidance.

130.    Allegations and claims that the FCSO has engaged in racial profiling and has adopted a pattern or practice of discrimination and selective enforcement of the laws have been widespread and have been covered in local media.

131.   Defendants Myers, McCormick and Dinkins knew or should have known that implementation of the 287(g) MOA by the FCSO was not consistent with the main objective of the 287(g) program in that the vast majority of individuals detained under the 287(g) program have not been arrested or charged with serious criminal violations.

132.   Defendants Myers, McCormick and Dinkins knew or should have known that FCSO officers have used minor traffic offenses as a pretense for checking the immigration status of individuals present in Frederick County.

133.   Defendants Myers, McCormick and Dinkins did not adequately supervise FCSO in their implementation of the 287(g) agreement, resulting in the violations of Plaintiff Orellana Santos's constitutional rights described in the foregoing claims.

134.   As a result of the Defendants' actions, Ms. Orellana Santos suffered damages, including but not limited to violation of her constitutional rights, loss of liberty, monetary damages, emotional distress, and physical pain and suffering.

## DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1) Enter a declaratory judgment that the actions of Defendants Openshaw, Doe, Jenkins, Frederick County Board of Commissioners and/or Defendants Myers, McCormick and Dinkins violated the United States Constitution.

2) As to Defendant Frederick County Board of Commissioners and Defendants Jenkins, Openshaw, Doe, Myers, McCormick, and Dinkins in their official capacities, issue a preliminary injunction and permanent injunction (a) restraining and enjoining Defendants

from stopping and interrogating individuals regarding their immigration status based solely on their perceived race, ethnicity and/or national origin; (b) restraining and enjoining Defendants from selectively enforcing local ordinances and laws; (c) restraining and enjoining Defendants from arresting individuals based on civil immigration violations unless those individuals have been charged and/or arrested for a criminal offense under Maryland law.

3) As to Defendants Jenkins, Openshaw, Doe, Myers, McCormick, and Dinkins in their personal capacities, award Ms. Orellana Santos compensatory damages not less than $1 million.

4) Award Ms. Orellana Santos the cost of this action;

5) Award Ms. Orellana Santos reasonable attorney fees pursuant to 42 U.S.C. § 1988(b).

6) Grant such other relief as the Court deems just and equitable.

Dated: November _10_, 2009

John C. Hayes, Jr. (Bar No. 01936)
David West (Bar No. 17610)
Cynthia Crawford (Bar No. 16864)
NIXON PEABODY LLP
401 Ninth Street, N.W., Suite 900
Washington D.C.  20004
(202) 585-8000 (phone)
(866) 814-2042 (facsimile)
jhayes@nixonpeabody.com
dwest@nixonpeabody.com
ccrawford@nixonpeabody.com

Kimberly Jandrain (Bar No. 17391)
Coburn & Coffman, PLLC
1244 19th, NW
Washington, DC 200036
(202) 657-5470 (phone)
(866) 561-9712 (facsimile)
kj@cclegal.us

Sebastian G. Amar (Bar No. 29064)
CASA de Maryland
734 University Blvd E
Silver Spring, MD 20903
(301) 431-4185 (phone)
(301) 431-4179 (facsimile)
samar@casamd.org

Jose L. Perez (pro hac vice application pending)
Diana S. Sen (pro hac vice application pending)
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, NY 10013
(212) 219-3360 (phone)
(212) 231-4276 (facsimile)
jperez@latinojustice.org
dsen@latinojustice.org


*Counsel for Plaintiff Roxana Orellana
Santos*