IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **ROXANNA SANTOS** | \* |
| | \* |
| Plaintiff, | \* |
| | \* |
| v. | \*   Civil No. L-09-2978 |
| | \* |
| **FREDERICK COUNTY BOARD** | \* |
| **OF COMMISSIONERS, et al.,** | \* |
| | \* |
| Defendants | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM

This case concerns the allegedly unlawful detention and arrest of Plaintiff Roxana Santos by two Frederick County Sheriff's Deputies, Defendants Jeffrey Openshaw and Kevin Lynch ("Deputies"). Now pending is the Deputies' Motion for Summary Judgment. Docket No. 84. The issues have been comprehensively briefed, and on November 15, 2011, the Court heard oral argument on the Motion. For the reasons stated herein, the Court will, by separate Order, GRANT the Motion.

### I.   BACKGROUND

Shortly after 10:00 a.m. on October 7, 2008, Roxana Santos was sitting on the curb in the alleyway behind Common Market, a food co-op where she worked as a dishwasher. Santos was eating a bit of bread while she waited for her 11:00 a.m. shift to begin.

At the same time, Frederick County Sheriff's Deputies Jeffrey Openshaw and Kevin Lynch were engaged in a routine patrol of the area. Their route took them through the parking lot of the Evergreen Square shopping center, which houses Common Market and several other businesses and restaurants. Openshaw and Lynch drove around to the rear of a large building

containing Common Market and Gold's Gym, where they encountered Santos sitting on the curb next to a large storage container of the type transported by cargo ships. There are three separate accounts of the circumstances surrounding the Deputies' approach.

According to Openshaw and Lynch, when Santos observed them driving toward her in a marked patrol car, she got up, quickly gathered her things, and ducked around the corner of the storage container out of their view. Though the patrol car was approximately 150 feet away, Deputy Lynch testified that he saw Santos regard them with a startled look before withdrawing behind the container: "Her eyes got large, like, oh, no, there's the police." Lynch Dep. 43:16–21. The Deputies commented to one another that the behavior seemed odd, and they decided to question Santos.

By contrast, Santos claims that she had just sat down when she noticed the patrol car approaching, but thought nothing of it. She denies doing anything even arguably suspicious. Santos states that as she remained seated, the car pulled up, Deputies Openshaw and Lynch got out, and Openshaw began to ask questions.

The third account comes from Eric Lofhjelm, another Common Market employee. Lofhjelm was standing on the building's loading dock, which looked down the alley towards the far side of the building from which the Deputies approached. Lofhjelm noticed the patrol car come around the corner. When it passed out of his field of view, he stepped out onto a stairwell from which he could see both the patrol car pulling up to the storage container and Santos sitting on the curb. Lofhjelm observed the parties' interaction for a short time before going inside, though he was too far away to hear anything. During the time that he watched, Lofhjelm did not see Santos get up or move.

From this point on, the parties' versions of the facts are largely congruent, except as expressly noted. Accounts agree that the two Deputies circled around the storage container, approaching Santos from opposite directions. They wore standard issue Sheriff's uniforms and had guns on their hips. Deputy Openshaw greeted Santos and asked if she was on break. Santos said, yes. According to Openshaw, a language barrier was immediately apparent. He inquired if Santos worked at Common Market, and again she said, yes. Openshaw then asked if Santos had identification. Santos understood the question, but responded in Spanish that she had none. Openshaw asked if she had a passport and Santos responded, this time in English, that she had a passport but that she had left it at home.

Deputy Openshaw then asked Santos her name. He testified that when he could not understand Santos's attempt to spell it for him, he gave her his notepad with a request that she write out her name and date of birth. According to Openshaw, Santos complied. Santos, by contrast, does not remember either Deputy asking for any such information or giving her paper and pencil.[1] At no point did either Deputy question Santos on the subject of her immigration status.

While Santos remained seated, Deputy Openshaw withdrew to confer with Deputy Lynch. Though Santos could not understand what the officers were doing, Openshaw used his radio to run a routine warrant check, providing the dispatcher with the name Roxanna Elizabeth Orellana Santos, born [month] [day], 1980.[2] At some point, Santos produced a Salvadoran ID card from her purse. She offered it to the Deputies, one of whom walked over to retrieve it.

---

[1]   When asked what became of the piece of paper, Openshaw responded that he gave it to an ICE agent at the police station.

[2]   The Court has redacted Santos's date of birth to preserve her privacy.

Openshaw testified that Santos offered the ID after she had written down her name and birthdate, but he could not recall if this occurred before or after he called in the warrant check.

A short time later, the dispatch officer notified the Deputies that Santos was the subject of an Immigrations and Customs Enforcement ("ICE") warrant for immediate deportation. Openshaw testified that at this point Santos was not free to leave, but he did not immediately place her under arrest. Instead, the Deputies requested verification of the warrant, meaning that someone from the Sheriff's Office would contact ICE to determine whether it was still active.[3]

While the warrant was being verified, Santos asked the Deputies if she could get up. Openshaw said, no, and gestured that she should remain seated. Eventually, the dispatch officer radioed back that the warrant was verified and active. Santos, deciding it was time for her to go to work, attempted to stand up and leave. At this point the Deputies handcuffed her, placed in the patrol car, and transported her to patrol headquarters.[4]

---

[3] Deputy Openshaw testified that this was standard procedure:
> At that point they need to verify the warrant, okay. In other words, contact whatever agency . . . had the warrant. Our agency would contact that agency to verify that the warrant was still active, because at times sometimes there may be a warrant that has been served or has, for whatever reason, gone inactive, for whatever reason, and they may not want it.
> Or there would be instances from other states where a warrant—they may not want to extradite. . . . Let's say somebody's from Oklahoma and they're up here and we pull them up here and run a check on them, they have a warrant, it may be for like a child support, they're not going to extradite the person. So we just say, "Hey, you got a warrant through Oklahoma for whatever reason, you might want to get that taken care of, we're not taking you in, they don't want you," that type of thing.

Openshaw Dep. 71:8–72:5.

[4] The amount of time taken up by these events is somewhat unclear. Santos claims that the initial questioning session, after which she presented her ID card, lasted fully 15 minutes. An "event chronology" offered by the Defense shows that a report of suspicious activity was called in at 10:27 a.m., and that the information relating to the warrant check was communicated to dispatch at 10:28 a.m. Openshaw testified that standard protocol would have been to send the initial communication to dispatch before the Deputies left the car, but that he could not remember specifically whether the standard protocol was followed on the day in question. The chronology shows "pending confirmation of warrant" at 10:37 a.m., and arrival at Patrol Headquarters by 10:42 a.m. Lofhjelm testified that the entire encounter, from the time of the Deputies' arrival to the time they handcuffed Santos and placed her in the patrol car, lasted somewhere between five and eight minutes.

At headquarters, Santos was turned over to an ICE agent for questioning. After temporary detention in the Frederick County Adult Detention Center and Baltimore Adult Detention Center, ICE transferred Santos to the Dorchester County Jail in Cambridge, Maryland, where she remained until her supervised release on November 13, 2008. Santos was not deported, and the record does not reveal her current immigration status.

On November 10, 2009, Santos filed the instant suit, naming as defendants Deputies Openshaw and Lynch, Frederick County Sheriff Charles Jenkins, the Frederick County Board of Commissioners, and several other individuals from ICE and the Department of Homeland Security. Santos eventually agreed to dismiss her claims against the federal Defendants and to bifurcate all claims of supervisory liability against Sheriff Jenkins and the Board of Commissioners. The supervisory liability claims have been stayed pending resolution of the case against the officers. Santos filed a Second Amended Complaint containing the following counts:

- Count I – Unlawful seizure, under 42 U.S.C. §1983, against Deputies Openshaw and Lynch in their official and individual capacities.

- Count II – Unlawful arrest, under 42 U.S.C. § 1983, against Deputies Openshaw and Lynch in their official and individual capacities.

- Count III – Violation of Fourteenth Amendment right to equal protection, under 42 U.S.C. § 1983, against Deputies Openshaw and Lynch in their official and individual capacities.

- Count IV – Conspiracy under 42 U.S.C. § 1985(3), against Deputies Openshaw and Lynch in their official and individual capacities.

- Count V – Supervisory liability, against Sheriff Jenkins, in his official and individual capacities. (bifurcated and stayed)

- Count VI – A claim against the Frederick County Board of Commissioners under 42 U.S.C. § 2000d, which prohibits exclusion from participation in, denial of benefits of, and discrimination under federally assisted programs on ground of race, color, or national origin.  (bifurcated and stayed)
- Count VII - <u>Monell</u> entity liability against the Frederick County Board of Commissioners.  (bifurcated and stayed)

Deputies Openshaw and Lynch now move for summary judgment as to Counts I–IV.

## II.     <u>Legal Standard</u>

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986); <u>see also</u> <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial).

Nevertheless, in determining whether there is a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party.  <u>Pulliam Inv. Co. v. Cameo Properties</u>, 810 F.2d 1282, 1286 (4th Cir. 1987).  Hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment.  See <u>Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro</u>, 64 F.3d 962, 967 (4th Cir. 1995).

III.   ANALYSIS

    a.  **Unlawful Seizure (Counts I and II)**

The Supreme Court has recognized three distinct types of police-citizen interaction: (i) arrests, which must be supported by probable cause, see Brown v. Illinois, 422 U.S. 590 (1975), (ii) brief investigatory stops, which must be supported by reasonable articulable suspicion, see Terry v. Ohio, 392 U.S. 1 (1968), and (iii) consensual encounters between police and citizens, which require no objective justification, see Florida v. Bostick, 501 U.S. 429, 434 (1991).  As the first step in determining whether Santos was seized unlawfully, the Court must decide when she was seized for purposes of the Fourth Amendment.  The Court must then decide whether the Deputies possessed adequate justification for the seizure at the time it occurred.

A seizure does not occur so long as, in view of the totality of the circumstances surrounding the stop, "a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter."  Id. at 436; United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002).  The encounter triggers Fourth Amendment scrutiny only when it loses its consensual nature.  Bostick, 501 U.S. at 434.  The test is one of objective reasonableness, and the subjective feelings of both the officers and the subject are irrelevant.  Weaver, 282 F.3d at 309.  Factors considered by the courts to determine whether there has been a seizure include the time, place, and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the officer's statements to others present during the encounter, the threatening presence of several officers, the potential display of a weapon by an officer, and the physical touching by the police of the citizen.  Id. at 309–10.

While there is no bright line test for determining when a seizure has occured, courts have offered guidance by identifying factors and circumstances that do not, in and of themselves,

constitute a seizure. For example, a seizure "does not occur simply because a police officer approaches an individual and asks a few questions." Bostick, 501 U.S. at 434. "[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cnty, 542 U.S. 177, 185 (2004) (quoting INS v. Delgado, 466 U.S. 210, 216 (1984)). While retention of a subject's identification card or other personal property is "highly material," the subject is not seized merely because an officer retains the identification beyond the time needed for a routine procedure, such as a warrant check. Weaver, 282 F.3d at 310.

Santos urges that she was seized as soon as the Deputies approached and began to question her. Openshaw and Lynch submit that Santos was not seized until she was actually handcuffed. In this respect both sides ask too much.

Given the totality of the circumstances, the Deputies' initial approach and questioning fell well short of seizure. Santos points to certain factors in an attempt to demonstrate that the Deputies asserted authority over her from the very beginning. She was approached by not one but two officers, who circled around the storage container in order to approach her from opposite directions and who stood while she remained sitting. There were no other people nearby. The storage container was between Santos and the Common Market, and the Deputies stood on either side of her, limiting her possible avenues of departure. The Deputies did not ask Santos whether she would mind answering questions, and they did not advise her that she was free to decline or to leave. They "repeatedly" requested identification. Finally, Santos points out that she spoke limited English, had little formal education, and was unfamiliar with American police procedure.[5]

---

[5]   The parties have strenuously debated whether these last elements may properly be considered in an objective analysis of the circumstances faced by a hypothetical reasonable person. A language barrier, at least, may

On the other side of the ledger, however, the Deputies did not touch Santos, brandish their weapons, or even use a commanding tone of voice. From all indications, they were perfectly polite. Santos was alone and clearly the target of their investigation, but the questioning occurred outside, in broad daylight. Though the Deputies stood between Santos and her place of employment, they did not box her in. The case law is clear that just because a police officer has possession of a subject's ID, this does not mean that the subject cannot leave. Pedestrian encounters are much less restrictive than traffic stops, and a police encounter does not constitute a seizure just because it would be awkward for the subject to walk away. See Id. at 311–12.

The Court must also reject the argument that Santos was seized only when she was placed in handcuffs. Santos was seized within the meaning of the Fourth Amendment when she asked if she could get up and Deputy Openshaw gestured that she should remain seated. Under the circumstances, Openshaw's gesture would have communicated to a reasonable person that she was not at liberty to rise and leave. The gesture was a show of authority to which Santos submitted by remaining seated. From that point forward the encounter was nonconsensual, and Santos's Fourth Amendment rights were implicated.

The level of suspicion required to justify the seizure depends on the extent of the restraint. When Openshaw directed Santos to remain seated, she was not yet under arrest. Instead, she was temporarily detained while the Deputies inquired whether the ICE warrant was

---

be relevant in some limited cases. See United States v. Gray, 883 F.2d 320, 323 (4th Cir. 1989) (citing United States v. Patino, 649 F.2d 724 (9th Cir.1981)). Yet, courts must be mindful of the Supreme Court's admonition that "[t]he benefit of the objective custody analysis is that it is designed to give clear guidance to the police" and to avoid burdening them "with the task of anticipating the idiosyncrasies of every individual suspect and divining how those particular traits affect each person's subjective state of mind." J.D.B. v. North Carolina, 131 S. Ct. 2394, 2402 (2011) (quotations and citations omitted). Taking into account factors such as level of education and knowledge of police procedure would, at the least, strain this dictate. Because consideration of the personal characteristics proffered by Santos would not alter the Court's final determination of when a seizure occurred, there is no need to reach the question.

still in effect. Santos was "stopped" as that term is defined in Terry, meaning that reasonable articulable suspicion was required.

The Deputies contend first that any seizure was lawful from the very beginning of the encounter because, having observed Santos duck behind the storage container, they possessed reasonable suspicion that criminal activity was afoot and were, accordingly, entitled to investigate. They argue that while Santos claims she did nothing suspicious, her deposition testimony is not necessarily inconsistent with their account. What may seem innocent to a civilian may appear suspicious enough to a trained police officer to warrant at least a brief detention.

On the basis of the record, the Court finds that the versions of events related by Santos and by the Deputies differ sufficiently to create a disputed question of fact as to whether Santos did, indeed, move behind the storage container upon apprehending the Deputies' approach. Such behavior would have given the Deputies the reasonable suspicion required for a Terry stop. For purposes of the pending Motion for Summary Judgment, however, the Court will assume that Santos did nothing when she first spotted the Deputies that would have warranted an investigatory stop.

As stated, however, seizure did not occur until Deputy Openshaw gestured to Santos that she should remain seated. Openshaw testified that, at the time he did so, he had already received notice from the dispatch officer that Santos was the subject of an outstanding warrant. Santos has offered no evidence to rebut Openshaw's testimony, and she acknowledges that this piece of information supplied not just reasonable suspicion, but the probable cause required for an arrest.[6] For this reason, the Deputies' actions at no time violated Santos's Fourth Amendment rights.

---

[6] Relegating this dispositive question to a footnote, Santos attempts to call the sequence of events into question by pointing to certain inconsistencies in the parties' deposition testimony. See Pl.'s Opp. 22 n. 10

### b. Equal Protection (Count III)

Santos alleges violation of her Fourteenth Amendment Equal Protection rights on the ground that the Deputies' decision to question her was predicated on nothing more than her Latina appearance. An equal protection violation occurs in one of two ways: (1) when a law or policy explicitly classifies people based on race, or (2) when a law is facially neutral, but its administration or enforcement disproportionately affects one class of persons over another and discriminatory intent or animus is shown. Sylvia Dev. Corp. v. Calvert Cnty, 48 F.3d 810, 818–19 (4th Cir. 1995). Santos does not allege that the Sheriff's Office had a policy of explicit classification on the basis of race or ethnicity. She does, however, allege that "Defendants Openshaw and Lynch subjected Plaintiff Orellana Santos to selective law enforcement out of a bad faith and unlawful intent to drive her and other residents of Latino and/or foreign-born appearance from Frederick County." Am. Compl. ¶ 79.

It is well established that police may not seize a person[7] or otherwise selectively enforce the laws solely on the basis of race or ethnicity. See, e.g., Whren v. United States, 517 U.S. 806, 813 (1996). As stated above, however, Deputies Openshaw and Lynch had ample neutral evidence to seize Santos when the dispatcher informed them of the open warrant. Moreover, Santos has pointed to no similarly situated individuals—those with outstanding warrants—who received preferential treatment from the Deputies.

---

("Defendant Openshaw stated that she wrote her information down on a notepad; Defendant Lynch stated that he did not remember; and Ms. Orellana Santos said she never was asked for her name or date of birth and never wrote it down. . . . Furthermore, Defendant Openshaw admitted that he did not know when he received the national identification card in the sequence of events."). It is undisputed, however, that Openshaw somehow obtained Santos's name and date of birth and called them in to dispatch. It is immaterial whether he retrieved this information from Santos's ID card, a piece of paper, or both, because there is nothing in the record to contradict his assertion that he had already received a response to the warrant check at the time he motioned Santos to stay seated.

[7] The Court pauses to note that Santos's immigration status is irrelevant here. The Supreme Court has long recognized that the guarantees of the Equal Protection Clause extend to illegal aliens as well as to citizens. See Plyler v. Doe, 457 U.S. 202, 210–15 (1982).

She maintains, however, that the Equal Protection Clause may be violated short of a seizure if police target an individual for informal questioning because of his or her ethnicity. Santos relies on the case of United States v. Avery, 137 F.3d 343, 353 (6th Cir. 1997), in which the Sixth Circuit stated that "consensual encounters may violate the Equal Protection Clause when initiated solely based on racial considerations." Santos has not identified, and the Court's own research has not unearthed, any case standing for the same proposition in the Fourth Circuit. In United States v. Henderson, 85 F.3d 617 (table) at *3 (4th Cir. 1996), the court declined to reach the question, upholding the district court's factual determination that police officers approached the defendant based on other, permissible factors "[w]ithout deciding whether selecting persons for consensual interviews based solely on race raises equal protection concerns."

For a number of reasons, the Court declines Santos's invitation to adopt the Sixth Circuit's stance on this issue. By definition, a consensual encounter with the police gives rise to neither claim nor injury. Under existing law, a definable event, either a Terry stop or an arrest, must serve as the basis for suit. If Santos is correct, almost any encounter between the police and a person might be actionable, depending on the subjective intent of the officer.

Imagine the instant set of facts, with a few slight variations. The officers, as part of their daily patrol, encounter Santos in the alleyway, eating her lunch. They approach, introduce themselves, and ask if she has noticed any suspicious activity in the neighborhood. Santos says she hasn't seen anything. The officers then ask for identification. Santos produces a Maryland driver's license, which they examine briefly and then hand back. The officers thank Santos for her time, tip their caps, and proceed on their way. Under the standard Santos urges on the Court,

she could then sue, claiming that she was approached for no reason other than her Latina appearance. One would be hard pressed, however, to identify the harm she had suffered.

In addition, recognizing an Avery claim would create a host of litigation problems. For instance, using the above hypothetical, one must determine the point at which a claim would accrue. Would it accrue when the Deputies decided to approach Santos, or when they asked for identification, or when they examined her driver's license? Moreover, by focusing on the officers' subjective intentions, Avery directs the court into an area that the Supreme Court has repeatedly taken pains to avoid. Under Fourth Amendment jurisprudence, the Supreme Court has instructed the lower courts to focus on the facts and circumstances of the encounter rather than the mindset of the officers involved. A pure heart will not save an unfounded seizure, and a wicked heart will not invalidate a seizure justified by the attendant facts. See, e.g., Brigham City v. Stuart, 547 U.S. 398, 404 (2006) ("The officer's subjective motivation is irrelevant."); Bond v. U.S., 529 U.S. 334, 339 n. 2 (2000) ("[T]he issue is not [the agent's] state of mind, but the objective effect of his actions."); Scott v. U.S., 436 U.S. 128, 138 (1978) ("Subjective intent alone . . . does not make otherwise lawful conduct illegal or unconstitutional."); Massachusetts v. Painten, 389 U.S. 560, 565 (1968) ("Sending state and federal courts into the minds of police officers would produce a grave and fruitless mis-allocation of judicial resources.") (WHITE, J., dissenting).

Even if Avery were the law in this Circuit, however, Santos could not succeed. A selective enforcement claim requires a showing that enforcement in this case "had a discriminatory effect and . . . was motivated by a discriminatory purpose." Wayte v. United States, 470 U.S. 598, 608 (1985). Under the Sixth Circuit's standard, a plaintiff must still "demonstrate by a preponderance of the evidence that a police officer decided to approach [or

pursue] him or her solely because of his or her race." Avery, 137 F. 3d at 355 (quoting U.S. v. Travis, 62 F.3d 170, 174 (6th Cir. 1995)). Santos has offered insufficient evidence from which a jury could conclude that Openshaw and Lynch were motivated solely by her ethnicity.

Santos submits that the Frederick County Sheriff's Office has entered into a Memorandum of Understanding with ICE to help enforce certain provisions of federal immigration law. She also points to specific anti-immigrant remarks attributed to Sheriff Jenkins. Neither of these factors specifically implicates Deputies Openshaw and Lynch, however. It is undisputed that neither officer was involved in the so-called "287(g)" program. Lynch was on his seventh day of training as a new officer on the day of Santos's arrest, and Openshaw testified that he had heard of the program but knew little about it. Nor is there any evidence in the record that either officer was aware of Sheriff Jenkins's alleged stance on illegal immigration. Even assuming such knowledge, however, Santos's theory that Openshaw and Lynch would discriminatorily question Hispanic-looking individuals in an effort to curry favor with Sheriff Jenkins is no more than conjecture.

Santos also seeks to tease discriminatory intent from several alleged instances in which the Deputies deviated from what she characterizes as "normal protocol." For instance, her counsel asked on deposition whether Deputy Openshaw, when encountering a suspect, would normally ask for a name and date of birth. The Deputy agreed, and also testified that he did so in this instance. In her summary judgment papers, Santos claims that the officers failed to take this step, which she characterizes, on the basis of their testimony, as a "normal procedure." See Pl.'s Opp. at 38, Docket No. 87. Under the summary judgment standard, the Court must credit Santos's version of events. By this tactic, Santos seeks to create a series of deviations from standard procedure that prove discriminatory intent.

Santos cannot bootstrap her way past summary judgment.  All of the deviations concern petty matters about which an officer would enjoy substantial latitude.  Moreover, Santos has not shown why these minor deviations, assuming they occurred, would result from racial or ethnic bias.

Santos points out that this Court has, in the past, found that an inference of discriminatory intent may be warranted when there is arguably no legitimate justification for a seizure.  She seeks to intersect a racial profiling case in which the plaintiffs contended that Maryland State Troopers who stopped them were motivated by race.  See Md. State Conference of NAACP Branches v. Md. State Police, 454 F. Supp. 2d 339 (D. Md. 2006).  That case centered on Interstate 95, a highway that runs along the eastern seaboard from Miami to Maine connecting the major east coast cities.  I-95 is also a major artery for the transportation of drugs from Florida northward.  In Md. State Conference of NAACP Branches, several plaintiffs, supported by the NAACP, sued the Maryland State Police and individual troopers.  The plaintiffs contended that they were the victims of racial profiling, in which the troopers allegedly targeted cars driven by African Americans for pretextual stops in hopes of interdicting drugs.

In an opinion denying in part the defendant's motion for summary judgment, Judge Bredar of this Court found that there was sufficient evidence from which a jury could find that the stop of plaintiff Gary Rodwell was motivated by Rodwell's race.  In making his ruling, Judge Bredar relied on an evidentiary record that included the trooper's statement that the stop was "not really" for speeding, as well as "a backdrop of powerful circumstantial evidence of racial profiling in the form of statistics compiled by the Maryland State Police," showing "a remarkable deviation in regard to the percentage of African-Americans stopped and searched" in the area.  Id. at 348.

Md. State Conference of NAACP Branches is inapposite to Santos's suit because the quantum of evidence to substantiate an Equal Protection claim is lacking. Santos has offered no evidence, direct or circumstantial, statistical or otherwise, that points to discriminatory intent on the part of Deputies Openshaw and Lynch.[8] Rather, she suggests that any time police target a member of a protected class, and their asserted reasons for doing so are contested, the Court must assume that discrimination against the protected trait was the true motivator. If Santos were correct, the police would be subject to an Equal Protection suit whenever they approached a member of a minority group who contended that she had done nothing to attract their attention. Such a rule, which is not constitutionally mandated, would place the police in an untenable position and unreasonably hamper law enforcement.

Because Santos has failed to adduce sufficient evidence indicating a discriminatory motive, the Deputies are entitled to Summary Judgment on her Equal Protection claim.

### c. Section 1985(3) Conspiracy (Count IV)

Count IV of the Complaint claims that Openshaw and Lynch engaged in a conspiracy to deprive Santos of her civil rights in violation of 42 U.S.C. § 1985(3). An action under § 1985(3) consists of five essential elements: (1) A conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus, to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection

---

[8] Santos's Complaint does claim that an unidentified report or reports shows that less than 10% of persons arrested by the Frederick County Sheriff's Office under the "287(g) program" were arrested for a violent or serious crime, that the number of persons detained under the program in Frederick County for non-violent crimes is greater than the national average, and that, in 2008, over 90% of the persons arrested by the Sheriff's Office and detained under the program were of Latino descent. First, Santos has not actually offered any such evidence into the summary judgment record. Second, as stated above, it is clear that Openshaw and Lynch were not acting pursuant to the 287(g) program. Finally, Santos admitted at oral argument that she had no evidence of profiling or discriminatory enforcement relating to the area where the encounter took place, the Sheriff's Department as a whole, or officers not engaged in the 287(g) program in particular.

with the conspiracy. See United Brotherhood of Carpenters v. Scott, 463 U.S. 825, 828–29 (1983); Griffin v. Breckenridge, 403 U.S. 88, 102–03 (1971); Ward v. Connor, 657 F.2d 45, 47 n. 2 (4th Cir. 1981).

Because the Court finds no evidence of an underlying discriminatory animus, there can be no conspiracy.[9] Summary judgment is, therefore, proper on this count as well.

### IV.   CONCLUSION

For the foregoing reasons, the Court will, by separate Order of even date, GRANT the Deputies' Motion for Summary Judgment. Because the Court finds no constitutional violations in the actions of Deputies Openshaw and Lynch, Santos's claims against the Sheriff Jenkins and the Frederick County Board of Commissioners (Counts V through VII of the Second Amended Complaint) must be DISMISSED.

Dated this 7th day of February, 2012

$\qquad$ /s/ $\qquad$
Benson Everett Legg
United States District Judge

---

[9]   The Court also finds that Santos's conspiracy claim is foreclosed by the intra-corporate conspiracy doctrine. See Marmott v. Md. Lumber Co., 807 F.2d 1180, 1184 (4th Cir. 1986); Buschi v. Kirven, 775 F.2d 1240, 1251–52 (4th Cir. 1985).