**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

ROXANA ORELLANA SANTOS     :
       :
       :
     v.         :    Civil No. CCB-09-2978
       :
FREDERICK COUNTY BOARD OF   :
COMISSIONERS, et al.       :
       :

## MEMORANDUM

Plaintiff Roxana Orellana Santos sued several municipal and federal defendants for civil rights violations stemming from her arrest and detention based on a civil immigration warrant on October 7, 2008. Initially, defendants were granted summary judgment on all claims. Ms. Orellana Santos appealed as to the two arresting deputies, the Sheriff, and the Frederick County Board of Commissioners ("BOCC"). The Fourth Circuit held that her seizure was unconstitutional, but because the Deputies and Sheriff were eligible for qualified immunity in their individual capacities, it affirmed in part the summary judgment ruling. The claims made against the Deputies and Sheriff in their official capacities and against the BOCC were remanded for determination of municipal liability. Now pending are Ms. Orellana Santos's motion for summary judgment as to Counts III and IV (ECF No. 182) and the defendants' cross-motion for summary judgment on all counts (ECF No. 183). The issues in this case have been fully briefed, and oral argument was heard on July 10, 2018. For the reasons stated below, Ms. Orellana Santos's motion for summary judgment will be granted on the issue of the County's liability for the final policy decision made by the Sheriff.

## BACKGROUND

The factual and procedural background of this case has been discussed at length in prior opinions, so this abbreviated summary includes only facts directly relevant to the pending motions. *See Santos v. Frederick Cnty. Bd. Of Comm'rs*, 725 F.3d 451 (4th Cir. 2013) *cert. denied*, 134 S. Ct. 1541 (2014); June 6, 2016 Mem. Order (ECF No. 162); Aug. 26, 2015 Mem. Op. (ECF No. 148); Feb. 7, 2012 Memo. (ECF No. 98).

On February 5, 2008, the Frederick County Sheriff's Office ("FCSO"), through Sheriff Charles Jenkins, entered into an agreement under 9 U.S.C. § 1357(g) with federal Immigration and Customs Enforcement ("ICE") to have certain FCSO employees assist in immigration enforcement. (*See* Ex. H, Memo. Of Agreement, ECF No.183-11.) Only those personnel trained and certified under the agreement were permitted to participate in immigration enforcement. Deputies Openshaw and Lynch were not participants in the program. The Deputies were, however, subject to a General Order issued by Sheriff Jenkins, entitled "41.2 Patrol Operations," and dated June 23, 2008, permitting patrol deputies to stop individuals "when the deputy has in their possession or is aware of an outstanding arrest warrant for the individual." (Pl.'s Appx., Ex. 4 to Jenkins Dep. (Dec. 5, 2016) at PA067, Section 41.2.3(B), ECF No. 182-3.) The deputies could become aware of an outstanding warrant by running a check in the National Crime Information Center database ("NCIC"). (Pl's Appx., Jenkins Dep. (Dec. 5, 2016) at PA036. 44:17-21, ECF No. 182-3.) This database contains criminal arrest warrants, as well as ICE civil immigration removal warrants.[1] When a NCIC check identified a warrant, Sheriff Jenkins

---

[1] By statute, NCIC is only permitted to contain criminal warrants. In practice, however, it has contained civil warrants since shortly after September 11, 2001, well before the incident that gave rise to this suit. *Santos*, 725 F.3d at 467-68; *see also* Ex. K, FBI Website for NCIC, at https://www.fbi.gov/services/cjis/ncic/ (stating that the

2

testified that "[c]ommon practice would be to detain that individual while you confirm the warrant." (Pl.'s Appx. Jenkins Dep. (Dec. 5, 2016) at PA039, 56:12-17, ECF No. 182-3; *see also* Pl.'s Appx, Lynch Dep. (Feb. 23, 2017) at PA398, 20:2-6, ECF No. 182-3.) Deputy Openshaw testified that once an active warrant is confirmed by dispatch, they are required to arrest the individual. (Pl.'s Appx, Openshaw Dep. (Feb. 23, 2017 ) at PA380, 14:10-15:12, ECF No. 182-3 ("If you come in contact with somebody who has an active warrant, once you identify that that person has an active warrant you have to take action."); Pl.'s Appx, Openshaw Dep. (Jan. 1, 2011) at PA392, 78:19-21, ECF No. 182-3 ("Unfortunately, once we verified that she had a warrant my hands are tied. I mean I have to take action.").)

On October 7, 2008, while on patrol, Deputy Sheriffs Jeffrey Openshaw and Kevin Lynch of the Frederick County Sheriff's Office stopped and asked Ms. Orellana Santos for identification. After approximately twenty minutes, Ms. Orellana Santos moved to leave, but Deputy Openshaw indicated that she should stay while he waited to see whether a civil ICE warrant for removal was active.[2] Ultimately, the deputies arrested and detained Ms. Orellana Santos on the basis of that civil warrant. Ms. Orellana Santos was brought to a Maryland detention center, turned over to ICE, and ultimately held in a jail in Cambridge, Massachusetts until her supervised release on November 13, 2008. *See generally Santos*, 725 F.3d at 457-58; June 6, 2016 Mem. Order at 1-2.

On November 10, 2009, Ms. Orellana Santos filed this lawsuit alleging civil rights violations related to her arrest and detention. (Compl., (ECF No. 1).) Initially, summary judgment was granted for the defendants on all claims. (Feb. 7, 2012 Order, ECF No. 99.) Ms.

___

database includes "Records on criminal aliens whom immigration authorities have deported and aliens with outstanding administrative warrants of removal.")

[2] The Fourth Circuit noted that this verification by dispatch was "standard procedure." *Santos*, 725 F. 3d at 458. It is also consistent with the protocol and deposition testimony quoted above.

Orellana Santos appealed her claims under 42 U.S.C. § 1983 against Deputies Openshaw and Lynch, Sheriff Jenkins, and the BOCC. (Notice of Appeal, ECF No. 111.) The Fourth Circuit held that "absent express direction or authorization by federal statute or federal officials, state and local law enforcement officers may not detain or arrest an individual solely based on known or suspected civil violations of federal immigration law." *Santos*, 725 F.3d at 465. Accordingly, the Fourth Circuit ruled that "the deputies violated Santos's rights under the Fourth Amendment when they seized her after learning that she was the subject of a civil immigration warrant and absent ICE's express authorization or direction." *Id.* at 468. The Circuit also held that qualified immunity barred claims against the Deputies and the Sheriff in their individual capacities. It remanded the remaining official capacity claims against the Deputies and the Sheriff, and the claim against the BOCC, to this court for determination of "whether the deputies' unconstitutional actions are attributable to an official policy or custom of the county or the actions of a final county policymaker." *Id.* at 470. The district court then permitted an amended complaint and allowed discovery.

The claims that remain before the court are as follows: count I for "Unlawful Seizure" against Deputies Openshaw and Lynch in their official capacities, count II for "Unlawful Arrest" against Deputies Openshaw and Lynch in their official capacities, count III for "Supervisory Liability" against Sheriff Jenkins in his official capacity, and count IV for "Entity Liability" against the BOCC. All claims are made pursuant to 42 U.S.C. § 1983. (Third Am. Compl. (ECF No. 150); *see also* June 16, 2016 Mem. Order.) The plaintiff filed her motion for summary judgment as to counts III and IV, against Sheriff Jenkins in his official capacity and the BOCC respectively, on August 25, 2017. (ECF No. 182.) The defendants filed a cross motion for

4

summary judgment on all counts and opposition to plaintiff's motion on September 22, 2017. (ECF No. 183.)

## ANALYSIS

### I.  Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added).  "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)).  "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48.  The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015).  At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

### II.  Municipal Liability

Municipalities may be held liable for constitutional violations committed by their

employees or agents when an official custom, policy, or practice of the municipality, or the decision of a final policymaker for the municipality, is responsible for causing the deprivation. *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 694 (1978). There are various avenues by which a plaintiff might attempt to establish the requisite municipal action needed to sustain Section 1983 liability. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-84 (1986). One such avenue—and the primary route attempted by the plaintiff in this case—is by showing that the decision was rendered by an individual with final policymaking authority over a particular subject matter in the given municipality. *Id.* at 483-84. In *Pembaur*, the Court reasoned, "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." 475 U.S. at 483-84.

In *Praprotnik*, the Court clarified that the determination of an individual's final policymaking authority is a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988). This is not to say that courts look for a state-law test for final policymaking; rather, courts must look to the details of state and local law to assess the distribution of policymaking authority under such laws. *Id.* at 124-25. It is about power. *McMillian v. Monroe Cty., Ala.,* 520 U.S. 781, 785-86 (1997). And the Court has repeatedly declared it to be a question of law reserved for the court. *See id.*; *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989);. As Justice O'Connor explained in *Praprotnik*, "state law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's

business." *Id.* at 125. "[C]ustom and usage having the force of law" is also relevant. *Jett*, 491 U.S. at 737. The inquiry is issue-specific and concerns not the mere "technical characterization of an official as a state or county employee," but centers on a functional assessment of "final policymaking authority" in the relevant "area of the city's business." *Dotson v. Chester*, 937 F.2d 920, 924 (4th Cir. 1991) (quoting, in part, *Praprotnik*, 485 U.S. at 123-24). Thus the crux of the matter is whether, under close scrutiny of state and local laws and customs, the "governmental official . . . is the final policymaker[] for the local government in a particular area, or on a particular issue." *McMillian*, 520 U.S. at 785.

## A. Section 1983 Liability of Deputies Openshaw and Lynch

Because the Fourth Circuit held that Deputies Openshaw and Lynch violated Ms. Orellana Santos's Fourth Amendment rights, the only remaining question is whether the unlawful seizure and arrest was the result of a municipal policy, practice, or custom, or the decision of a final decisionmaker. The plaintiff advances three theories in Count III of the amended complaint under which she seeks to establish such liability: (1) that Sheriff Jenkins promulgated an official policy as a final county policymaker, (2) that the Sheriff failed to adequately train or provide relevant guidance to his deputies, and (3) that the county ratified the Deputies' unlawful actions. Ms. Santos need only surmount the summary judgment threshold for any one of these independent bases for Section 1983 liability. Here, her first theory prevails; the second and third theory need not be addressed. As explained below, this court concludes that the constitutional violations were traceable to Sheriff Jenkins, acting as a final decisionmaker for the county regarding law enforcement policy related to immigration for FCSO. Deputies Openshaw and Lynch also would be liable in their official capacities because they acted as required by the

7

municipal policy set by Sheriff Jenkins as final policymaker.[3] Accordingly, the County is liable for any damages caused by the violation of Ms. Santos's constitutional rights.

Sheriffs in Maryland may be considered either state or, in limited circumstances, county officials. The defendants contend that Sheriff Jenkins and Deputies Openshaw and Lynch are state employees under Maryland law, and, as a result, are insulated from suit under Section 1983. The plaintiff, by contrast, insists that, for present purposes, Sheriff Jenkins and his deputies are to be considered county employees. In *Dotson*, a case similarly hinging on the source of a Maryland sheriff's authority, albeit one concerning a sheriff's authority over a local county jail, the Fourth Circuit concluded that "the Sheriff is not always a state employee or always a county employee. He may, on occasion, be both, or sometimes one and sometimes the other. It all depends on the particular function the Sheriff is performing." *Dotson*, 937 F.2d at 928. Critically, the Circuit's subsequent determination that the Sheriff was a county employee in that case came only after a searching analysis of Maryland and Dorchester County law regarding the Sheriff's prerogatives and the historical development of his authority over the jail. *Id.* at 925-27. It reasoned that "[s]tate statutes . . . do not specifically empower the Sheriff to . . . operate the County Jail" and that the "precise dimension of sheriffs' duties in Maryland frequently have been established by county codes and other local laws." *Id.* at 927. The court also surveyed Maryland case law on sheriffs' employment status finding it "not dispositive." *Id.* at 926.

Maryland state cases that address a sheriff's employment status go out of their way to forestall any conclusion about a sheriff's status for Section 1983 or Eleventh Amendment purposes. While sheriffs are generally considered state employees under Maryland law, *see*

---

[3] Ms. Santos does not ask for summary judgment on Counts I and II; a finding of liability on those counts would not entitle her to any additional relief.

*Rucker v. Harford County*, 316 Md. 275, 289 (1989), state courts repeatedly note that the analysis might be different "for the purposes of the Eleventh Amendment or 42 U.S.C. § 1983 [which] are federal law issues." *Id.* at 280-81; *see also Clea v. Mayor & City Council of Baltimore*, 312 Md. 662, 670 n.5 (1988); *Ritchie v. Donnelly*, 324 Md. 344, 357, 597 A.2d 432, 438 (1991) (stating that "[w]hile, under Maryland law, a sheriff is a state official, the state law classification is not dispositive for purposes of §1983."). Even the most recent case the defendants cite to support a sheriff's state-employee designation, in the very passage preceding the citation, expressly differentiates between §1983 and Maryland actions, conspicuously withholding any comment on the former. *Penhollow v. Bd. of Comm'rs for Cecil Cty.*, 116 Md. App. 265, 296 (1997). In *Rucker,* the case the defendants rely on most heavily, the Maryland Court of Appeals noted that "[t]his conclusion does not mean that, for some purposes and in some contexts, a sheriff may not be treated as a local government employee." *Rucker*, 316 Md. at 280-81, 289. Indeed in *Dotson*, the Fourth Circuit specifically reasoned that *Rucker*'s conclusion that a sheriff is a state employee for purposes of tort liability, "does not compel the conclusion that the Sheriff, when managing the County Jail, is a state policymaker." *Dotson*, 937 F.2d at 926.

Federal courts have not announced a discrete doctrinal test for final policymaking that is binding in this jurisdiction. *McMillian*, the most recent Supreme Court case to squarely address the issue, required the Court to conduct a detailed textual analysis of the Alabama Constitution, local history, and the Alabama code to reach the conclusion that the sheriff there was a policymaker for the state. *McMillian*, 520 U.S. at 785-92. The Court announced no test for its determination. Instead, the design of the Court's local statutory examination mirrored that of the

Fourth Circuit in *Dotson.* The Tenth Circuit, after conducting an extensive survey of cases on this question, declared: "[W]e can identity three elements that help determine whether an individual is a 'final policymaker': (1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decisions are final—i.e., are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Randle v. City of Aurora,* 69 F.3d 441, 448 (10th Cir. 1995).

When sheriffs are involved, federal circuit court decisions are divergent. *See, e.g., Brewster v. Shasta County,* 275 F.3d 803 (9th Cir. 2004) (sheriff is a local official in California); *Mercado v. Dart,* 604 F.3d 360 (7th Cir. 2010) (Illinois sheriff is not a state officer); *Huminski v. Corsones,* 396 F.3d 53 (2d Cir. 2005) (Vermont sheriff is a state officer). In *McMillian,* however, the Supreme Court both anticipated and accepted such variation. It declared that "since it is entirely natural that both the role of sheriffs and the importance of counties vary from State to State, there is no inconsistency created by court decisions that declare sheriffs to be county officers in one State, and not in another." *McMillian,* 520 U.S. at 795. Therefore, cases from other circuits are of limited probative value here given the necessarily local nature of the inquiry.

The defendants argue that, all inconsistencies in the case law aside, a sheriff's exercise of law enforcement duties is inherently state action. They attempt to distinguish *Dotson* on this ground, which involved a Sheriff's authority over a county jail, and, instead, to analogize to *McMillian* which involved a sheriff's actions taken in the "area of law enforcement." *McMillian,* 520 U.S. at 784. The defendants contend that *Rossignol* similarly stands for the proposition that, in the Fourth Circuit, sheriffs are state employees when acting in a law enforcement capacity.

*See Rossignol v. Voorhaar*, 321 F.Supp.2d 642, 651 (D.Md. 2004); *Rossignol v. Voorhaar*, 316

F.3d 516, 524 (4th Cir. 2003) (holding that a sheriff's seizure of an election-day newspaper

edition was perpetrated under the color of state law and thus constituted state action). And yet,

the defendants only cite cases involving a sheriff's purported exercise of state executive power.

This case turns on the unusual fact that the 8 U.S.C. 1357(g) program and the agreement

reached between ICE and Sheriff Jenkins is not an exercise of state executive power—it is,

instead, a unique agreement whereby the federal government directly delegates its own plenary

power over immigration by deputizing local political subdivisions to "perform certain functions

of an immigration officer." (*See* Ex. H, Memo. Of Agreement, ECF No. 183-11.) Accordingly,

irrespective of Maryland case law or the common finding that a sheriff in Maryland conducting

law enforcement duties is a state actor, this case requires the fine-grained context-specific

analysis of policymaking authority mandated by *McMillian* and its forebears.

Close inquiry finds Sheriff Jenkins as the final policymaker for Frederick County over

the "particular issue" in question—Frederick County's participation in the 8 U.S.C. 1357(g)

program. Sheriff Jenkins, on behalf of FCSO, chose to enter FCSO into the immigration

enforcement agreement with the federal government. While Ms. Orellana Santos was not seized

pursuant to that agreement, (the two Deputies in question were not authorized under the

agreement to pursue immigration enforcement), her unconstitutional seizure and arrest are

directly traceable to FCSO's participation in that agreement and FCSO's subsequent failure to

differentiate between authorized and unauthorized officers in their patrol procedures. Sheriff

Jenkins, as signatory on the 1357(g) agreement, was aware that only officers trained and certified

under the agreement were permitted to participate in immigration enforcement. Despite this fact,

11

he promulgated a General Order that required all patrol officers to run warrant checks on stopped individuals, and detain any individual with an outstanding warrant, regardless of whether the warrant was civil or criminal.

Under 8 U.S.C. 1357(g), "the Attorney General may enter into a written [immigration enforcement] agreement with a State, or any political subdivision of a State." Sheriff Jenkins did not enter the state of Maryland into a 1357(g) agreement; he entered FCSO into an agreement. Under the organization of the 1357(g) program, the agreement with FCSO must then have been between ICE and a political subdivision of a State. FCSO itself is not a political subdivision of Maryland—instead, Frederick County is a political subdivision under which FCSO operates.[4] Critically, as a practical matter, Sheriff Jenkins had the power to enter Frederick County into this agreement. He made the "deliberate choice to follow a course of action" and there was no other official in the county or in the state with the capacity to establish "final policy with respect to the subject matter in question" or to review Sheriff Jenkins's decision. *See Pembaur*, 475 U.S. at 483-84. Indeed, a functional view of the 1357(g) program and its relation to Frederick County shows that, in practice, the policymaking authority to enter into an immigration enforcement agreement resided completely with Sheriff Jenkins. *See Praprotnik*, 485 U.S. at 122. Following Justice O'Connor's mandate, we are led to an official with "the responsibility for making law or setting policy in [this] area of a local government's business." *Id.* at 125. It is Sheriff Jenkins. The answer here is not located in the archives of the state capital or the glossaries of the county code, *see McMillian* and *Dotson*, but rather resides in the unique structure of 1357(g) that allows

---

[4] *See also*, Exec. Order No. 13,767, 82 Fed. Reg. 8,793 (Jan. 25, 2017) (directing the Secretary of Homeland Security "to engage with Governors of States, as well as local officials, for the purpose of preparing to enter into" 1357(g) agreements). The order did not say "state and local officials," but Governors, who would have the authority to act for the State, and local officials, who could act for local entities.

local officials to elect to enforce federal immigration law and the customs and practices of Frederick County that granted this prerogative to Sheriff Jenkins. He had no such power for the state of Maryland.

Ratifying this conclusion is the fact that policymakers at the state level have repeatedly failed to approve such policies.[5] Until 2016, Frederick County was the only county in Maryland participating in the 1357(g) program.[6] This means that, at the time of Ms. Orellana Santos's arrest in 2008, FCSO's 1357(g) program was a unique operation within the State of Maryland. The defendants do not contend that Sheriff Jenkins was constrained by state policies in his decision to enlist FCSO, they do not contend that the State of Maryland had any capacity to review Sheriff Jenkins's decision to enlist FCSO, and they do not contend that the State of Maryland granted Sheriff Jenkins the authority to enter such agreements. *See Randle*, 69 F.3d at 448. Instead, they concede that "Sheriff Jenkins' policymaking authority is limited to the Sheriff's Office." (Defs.' Cross Mot. Summ. J. at p. 23, ECF No. 183-1.) FCSO's 1357(g) agreement, and the patrol orders through which it was enacted, were not a state policy. By contrast, they were limited to Frederick County and were made by the official who was, in practice, the final county decisionmaker regarding FCSO's cooperation with ICE: Sheriff Jenkins. In practice, Sheriff Jenkins acted as the final repository of county authority.

The narrow, localized scope of this policy distinguishes it from the facts of *McMillian*. In *McMillian*, the court reviewed Alabama state law extensively for the root of the Sheriff's law enforcement powers when determining whether a Sheriff could be held liable in his official

---

[5] *See* H.B. 276, 2011 Leg., 428th Sess. (Md. 2011) (failed state bill that would have required all State law enforcement agencies to participate in the 1357(g) program); H.B. 1362, 2017 Leg., 437th Sess. (Md. 2017) (state bill that passed the House but was not taken up in the Senate that would have curtailed state official's immigration enforcement without barring 1357(g) participation);

[6] Pl.'s Appx., Jenkins Dep. (Dec. 5, 2016) at PA044, 73:11-19, ECF No. 182-3 (to Sheriff Jenkins's knowledge, no other jurisdictions in Maryland participated in 1357(g) program prior to 2016).

capacity for a *Brady* violation that resulted in a wrongful conviction. *Id.* at 786-791. It

acknowledged four arguments that "cut in favor of the conclusion that sheriffs are county

officials:" (1) county treasury payment of the sheriff's salary, (2) county provision of equipment,

(3) the sheriff's jurisdictional limitation to county borders, and (4) the sheriff's election by

county voters only. *Id.* at 791. Ultimately, it found that despite these considerations, the county

lacked sufficient control over the activities of the Sheriff to classify him as a county official, and

Alabama state law clearly identified Sheriffs as state officials.

In this case, however, these same persuasive factors weigh more heavily than they did in

*McMillian.* The policy involved is applicable only to FCSO. Sheriff Jenkins is beholden to the

voters of Frederick County, who both elect him and pay the "salaries and many of the expenses

of the sheriffs' offices." *Rucker,* 316 Md. at 282; Md. Const. Art. IV, § 44. Sheriff Jenkins has

made his belief in the importance of strong immigration enforcement widely known, both during

his initial election campaign and through multiple press statements since.[7] He does not have the

law enforcement authority to enter into and decide how to implement a 1357(g) agreement for

the entire state, only for Frederick County. A key factor for the Court in *McMillian* was that the

Sheriff was enforcing state law. *See McMillian,* 520 U.S. at 790. Here, in stark contrast, the

sheriff was electing to enforce federal immigration law in Frederick County. This localized

strategy of strong immigration enforcement—which is counter to the prevailing policy of the

state—is different from the general exercise of state executive authority that resulted in a

constitutional violation in *McMillian.* When analyzed in turn, the persuasive factors identified in

---

[7] *See* Pl.'s Appx., Obj. Resp. Pl's Request for Admission at PA090-093, ECF No. 182-3; Pl.'s Appx., Jenkins Dep.
(Dec. 5, 2016) at PA058, 131:15-20, ECF No. 182-3 (stating his immigration position during his initial election as "I
believe in the rule of law, that the immigration laws should be enforced, and that it is maybe an obligation of local
law enforcement to get involved to the extent we can. Again, I view it as a large piece of public safety in my
county.").

*McMillian*, particularly the jurisdictional limits of the policy and the election by county voters, weigh more heavily in this case.

At oral argument, counsel agreed that General Order 41.2 required the Deputies to arrest Ms. Santos under the circumstances present in this case, and that the policy which caused the constitutional violation was that of not distinguishing an immigration ICE warrant for deportation from other (presumably criminal) arrest warrants. The defendants argue that the Deputies and the Sheriff did not know that civil warrants were in the NCIC database at the time of Ms. Orellana Santos's arrest. But the Sheriff's lack of actual knowledge is immaterial, because the inclusion of these civil warrants was public knowledge years before the unconstitutional arrest. *See* John Ashcroft, U.S. Att'y Gen., Prepared Remarks on the National Security Entry–Exit Registration System (June 6, 2002), available at http://www.justice.gov/archive/ag/speeches/2002/060502 agpreparedremarks.htm. If he did not actually know of the inclusion of civil warrants, he very well should have. The defendants also assert that the state of Maryland, not FCSO, provides NCIC training to its deputies, so the responsibility to train its deputies on the contents of the database is not theirs. This argument fails. Only FCSO deputies were involved in immigration enforcement. As discussed above, this involvement was a local decision unique to FCSO. There is no reason for the state to train all officers on civil immigration warrants, because the state is not involved in immigration enforcement. FCSO undertook the responsibility of immigration enforcement, and knew that only certified officials would be trained by ICE. It was the sole responsibility of Sheriff Jenkins to ensure that the general orders issued subsequent to the immigration enforcement FCSO decided to undertake appropriately limited the role of the non-1357(g) deputies. Instead, the

15

general order, as it was implemented, required non-1357(g) deputies such as Openshaw and Lynch to detain Ms. Santos based on a civil immigration warrant.

The defendants also contend that FCSO did not know that local officials could not enforce civil immigration warrants until the Fourth Circuit's ruling in this case, so they could not possibly have warned their deputies. These arguments are merely attempts to apply qualified immunity to municipal claims. Qualified immunity is not an available defense to municipal defendants or government officials sued in their official capacity under Section 1983, nor it is intended to extinguish a plaintiff's opportunity to find redress for the damage of constitutional violations committed by municipalities. *Owen v. City of Independence, Mo.*, 445 U.S. 622, 650 (1980).

Sheriff Jenkins issued the policies under which Deputies Openshaw and Lynch unconstitutionally seized and arrested Ms. Orellana Santos. Under the patrol order, the Deputies were *required* to detain Ms. Orellana Santos when a warrant was returned in NCIC, regardless of whether it was civil or criminal in nature. When issuing these policies, specifically when entering into the 1357(g) agreement and issuing the patrol policies through which it was enacted, Sheriff Jenkins was acting on behalf of Frederick County, not the state of Maryland. Therefore, Sheriff Jenkins is liable in his official capacity as the final policymaker, and Deputies Openshaw and Lynch would be liable in their official capacities because their unconstitutional actions are directly traceable to this policy.

## B. Eleventh Amendment

While the parties spar directly over Sheriff Jenkins's status as a final policymaker for Frederick County, they get tangled in their analyses' interaction with the Eleventh Amendment.

16

"Unlike with government officials sued in their individual capacity, qualified immunity from suit under Section 1983 does not extend to municipal defendants or [municipal] government employees sued in their official capacity." *Santos*, 725 F.3d at 470 (citing *Owen*, 445 U.S. at 650.) It is because "qualified immunity does not extend to municipal defendants," that this court must, on remand, "determine whether the deputies' unconstitutional actions are attributable to an official policy or custom of the county or the actions of a final county policymaker." *Santos*, 725 F.3d at 470. Thus, it would seem, a finding that the Sheriff is or is not a state official in this case and the availability of Eleventh Amendment immunity would rise and fall together. The Fourth Circuit held in *Ram Ditta* that a "particular state entity [or subdivision] may be entitled to immunity . . . if, in its operations, the state is the real party in interest." *Ram Ditta By & Through Ram Ditta v. Maryland Nat. Capital Park & Planning Comm'n*, 822 F.2d 456, 457 (4th Cir. 1987); *see also Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 123-24 (1979). Here, the *Ram Ditta* analysis largely tracks the final policymaking inquiry.

The Fourth Circuit enumerated the following test to determine whether an entity other than the state itself is eligible for Eleventh Amendment immunity:

> While many factors must be considered in determining whether an entity is the *alter ego* of the state, it is generally held that the most important consideration is [1] whether the state treasury will be responsible for paying any judgment that might be awarded...Other important inquiries underlying our consideration of eleventh amendment immunity include, but are not necessarily limited to, [2] whether the entity exercises a significant degree of autonomy from the state, [3] whether it is involved with local versus statewide concerns, and [4] how it is treated as a matter of state law.

*Ram-Ditta*, 822 F.2d at 457-58. "Under this sovereign dignity inquiry, a court must, in the end, determine whether the governmental entity is so connected to the State that the legal action against the entity would, despite the fact that the judgment will not be paid from the State

17

treasury, amount to the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." *Cash v. Granville Cty. Bd. of Educ.*, 242 F.3d 219, 224 (4th Cir. 2001) (quoting *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 58 (1996)).

Applying these factors to Sheriff Jenkins's policy decisions on behalf of Frederick County, the first factor is clear. The county treasury is responsible for any judgment that might be awarded. Md. Code, State Fin. & Proc. § 9-108.[8] Factor four is decidedly neutral. While, as discussed above, Maryland state law typically treats sheriffs and deputies as state employees, and the Sheriff's office is created by the Maryland Constitution, state law explicitly contemplates circumstances in which a Sheriff might be considered a local actor. *See, e.g., Rucker*, 316 Md. at 280-81.

The remaining two factors weigh against Eleventh Amendment immunity. Autonomy factors include "who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions." *Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 804 F.3d 646, 650-51 (4th Cir. 2015). Frederick County voters elect their sheriff, although the Governor has the right to fill a vacancy. Md. Const. Art. IV, § 44. The county provides the bulk of the funding for the entity. If anything, state policy seems to be moving in the opposite direction from Sheriff Jenkins, with the state legislature not signaling any desire to increase immigration enforcement throughout the state. While the law enforcement function of the Sheriff's office is typically overseen by the state, when deciding whether to

---

[8] It is worth noting that the Maryland Tort Claims Act, which requires county payment of judgments such as that which may be issued in this case, was passed after the decision in *Rucker*, which held judgments against Sheriffs, as state employees, would be paid by the State. 315 Md. at 292. This may indicate a movement by the state legislature away from the effects of the holding in *Rucker*. *See Dotson*, 937 F.2d at 927 ("Interestingly, after *Rucker,* the Maryland legislature appears to have ensured that, regardless of the characterization of the Sheriff, the counties would pay for sheriffs' torts…The legislature amended the state law…to require the counties either to carry insurance to cover claims against sheriffs or to reimburse the State for the costs of paying and defending claims.").

participate in federal immigration enforcement, Sheriff Jenkins operated independently from the state. He entered into the 1357(g) program for Frederick County. *See Lane v. Anderson*, 660 F. App'x 185, 197 (4th Cir. 2016). In the narrow field of federal immigration enforcement through the 1357(g) program, FCSO acts autonomously from the State—indeed it made the election to exercise federal power in Frederick County.

Similarly, only Sheriff Jenkins has authority to set local immigration enforcement policy. The 1357(g) program and FCSO patrol guidelines are limited in jurisdiction to FCSO. They have no statewide effect, as Sheriff Jenkins lacks the authority to enter into such an agreement and set relevant guidelines on behalf of any other jurisdiction or the State itself. The defendants argue that they participated in an immigration enforcement action in Anne Arundel County, demonstrating the wider scope of their participation in the 1357(g) program. The fact that ICE requested their assistance in another county only underscores the fact that the scope of the 1357(g) agreement was limited to FCSO officers—ICE could not request the assistance of Anne Arundel county officers because they did not have a 1357(g) agreement in place. More importantly, this case turns on the operation of the 1357(g) agreement in concert with FCSO patrol guidelines that failed to adequately explain FCSO's participation in the 1357(g) program and ensure that uncertified officers were not detaining individuals based solely on civil immigration warrants.

Nothing about subjecting Sheriff Jenkins and the Deputies in their official capacities to this suit undermines Maryland State sovereignty. Sheriff Jenkins, fulfilling the role to which he was elected by the people of Frederick County, made a local policy decision to enter into the 1357(g) program and to issue the general order. The County will bear any financial burden of

19

FCSO's deficiencies in patrol guidelines in connection with immigration enforcement. There is no state policy at issue in this case. The highly localized nature of FCSO's participation in the 1357(g) program, the autonomous nature of its implementation, and the county's funding of any award in this case outweigh any identification of Sheriff Jenkins and the Deputies as state employees. The Sheriff and Deputies are therefore not eligible for Eleventh Amendment immunity and the motion for summary judgment for Counts I, II, and III on that basis will thus be denied.

### C. Frederick County Board of Commissioners

The BOCC, while liable as the county responsible for covering Sheriff Jenkins, is not liable for Ms. Orellana Santos's constitutional violations under an independent ratification theory. As discussed above, Sheriff Jenkins acted as the final repository of county authority regarding immigration enforcement in Frederick County. The BOCC does not have adequate control over the law enforcement functions of Sheriff Jenkins or FCSO to have had the opportunity to prevent him from entering into the 1357(g) agreement or to require him to promulgate patrol policies that would have instructed non-1357(g) officers properly so as to avoid unconstitutional searches and seizures related to civil immigration warrants.

Ms. Orellana Santos argues that the BOCC's 2013 statement after the Fourth Circuit opinion was issued in this case indicates a ratification of the actions of Sheriff Jenkins and Deputies Openshaw and Lynch. The statement publicly expresses support and appreciation for FCSO and its deputies but without any reference to the actions that gave rise to this case. (*See* Ex. J, BOCC Letter, Aug. 8, 2013, ECF No. 183-16.) Even if the BOCC did appear to ratify the

deputies' actions and FCSO's policies, such a statement does not change the fact that the BOCC does not have the authority to intervene in FCSO's decision to participate in immigration enforcement for the County. Therefore, their approval of actions over which they exercise no control cannot create independent liability.

Finally, the county is required to pay for any damages caused by the Sheriff's constitutional violations, regardless of whether the BOCC is independently liable. *See Dotson*, 937 F.2d at 925 (quoting *Blackburn v. Snow*, 771 F.2d 556, 571 (1st Cir. 1985)) ("[the County] is liable because the Sheriff was the county official who was elected by the County's voters to act for them and to exercise the powers created by state law. Accordingly, the Sheriff's policy was Plymouth County's policy, and the County must respond in damages for any injuries inflicted pursuant to that policy.").

## III.    Damages

Having addressed the substance of the summary judgment motions, the remaining issue raised in the briefing relates to damages. The defendants argue that Ms. Orellana Santos is only eligible for $1 in nominal damages for the constitutional violations she suffered, because the unlawful seizure and arrest were not the proximate cause of any harms to her. In her initial motion, Ms. Orellana Santos requested that the issue of damages be preserved for trial if liability is found. The court finds that sufficient evidence exists of actual harm to Ms. Orellana Santos to survive the defendants' motion for summary judgment.

Mental and emotional distress caused by constitutional violations is compensable under Section 1983. *Carey v. Piphus*, 435 U.S. 247, 264 (1978). "[S]ubstantial damages should be awarded only to compensate actual injury or, in the case of exemplary or punitive damages, to

deter or punish malicious deprivations of rights." *Id.* at 266. *See also*, *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1245 (4th Cir. 1996) (compensable injury "must have actually been caused by the challenged conduct, and the injury must be sufficiently proved.") "A plaintiff's failure to prove compensatory damages results in nominal damages, typically one dollar." *Price.* 93 F.3d at 1246.

Ms. Orellana Santos has provided sufficient testimony concerning her mental and emotional distress, as well as physical ailments that were caused or exacerbated by her detention, to survive a motion for summary judgment. In her deposition, she describes back pain and a stomach ailment that she claims are a result of her arrest and detention, as well as difficulty sleeping and other mental and emotional distress she has suffered since her arrest. (Pl.'s Appx, Orellana Santos Dep. at PA005-018, ECF No. 182-3.) These descriptions are more than conclusory statements.

Defendants argue that Ms. Orellana Santos's injuries were not caused by her arrest and detention at the hands of Deputies Openshaw and Lynch. They contend that her injuries were actually caused by the "superseding legal acts" of the direction of a 1357(g)-certified officer to transport Ms. Orellana Santos from the scene, and her eventual transport and detention at the direction of an ICE agent. They cite *Bodine v. Warwick*, 72 F.3d 393, 400 (3d Cir. 1995), and *Trask v. Franco*, 446 F.3d 1036 (10th Cir. 2006), for the proposition that "officers only would be liable for the harm proximately or legally caused by their tortious conduct," not for any superseding cause. *Franco*, 446 F.3d at 1046.

It is difficult to square this argument with the facts. Deputies Openshaw and Lynch unconstitutionally detained Ms. Orellana Santos on the basis of a civil immigration warrant. The

22

transport and eventual detention of Ms. Orellana Santos were the direct downstream effects of that unconstitutional act. The 1357(g)-certified officer and the ICE officer who directed her transport were not independently aware of Ms. Orellana Santos's location and did not coincidentally realize the deputies had detained someone who happened to be subject to an outstanding civil immigration warrant. The instructions were issued because the deputies had already detained her and requested confirmation of the civil warrant. Emotional distress and accompanying physical ailments are the sorts of harm that can be expected to flow naturally from an unconstitutional arrest, and orders for transport and continued detention by a 1357(g)-certified officer and an ICE agent are events that would naturally flow from the confirmation of a civil immigration warrant during the course of that unconstitutional arrest. Even if the acts of the 1357(g) and ICE officers were independent and lawful, how much of the harm was attributable to the unconstitutional arrest and seizure as compared to their lawful acts would still be a genuine dispute as to material fact better left to a jury.

Finally, Ms. Orellana Santos also has made a request for declaratory relief, alleging that the policies resulting in her constitutional violations remain in place. The defendants did not address the facts supporting this argument. They merely attacked her reliance on *Ex Parte Young*, 209 U.S. 123 (1908) and stated that there has not been another seizure or arrest based on an immigration warrant since Ms. Orellana Santos was arrested.[9] This fact does not preclude the possibility of another seizure occurring. Defendants failed to address whether the policies have been changed, leading the court to believe that they have not. As the facts and arguments surrounding injunctive relief do not appear not been fully developed, at best, whether declaratory relief will be awarded also will be reserved for later determination.

---

[9] Plaintiff's motion to supplement will not be considered at this time. It is denied without prejudice.

## CONCLUSION

For the reasons stated above, summary judgment will be granted to the plaintiff as to Count III, for the Sheriff's actions in his official capacity and as a final policymaker for Frederick County, and granted in part as to Count IV. The defendants' Motion for Summary Judgment on Count IV will be granted as to the plaintiff's ratification and independent liability theories, but denied as to the County's liability for the policy decisions of Sheriff Jenkins. Summary judgment will be denied to the defendants as to Counts I, II, and III and their argument for nominal damages.

A separate order follows.

_____  9/27/18
Date

_____
Catherine C. Blake
United States District Judge